### ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY *v.* SOUTHERN EXPRESS COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MISSOURI.

### MEMPHIS & LITTLE ROCK RAILROAD COMPANY *v.* SOUTHERN EXPRESS COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF ARKANSAS.

### MISSOURI, KANSAS & TEXAS RAILWAY COMPANY *v.* DINSMORE, PRESIDENT & SHAREHOLDER IN ADAMS EXPRESS COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF KANSAS.

Argued together November 3, 4, 5, 6, 1885.—Decided March 1, 1886.

Railroad companies are not required by usage, or by the common law, to transport the traffic of independent express companies over their lines in the manner in which such traffic is usually carried and handled.

VOL. CXVII—1

Railroad companies are not obliged either by the common law or by usage to do more as express carriers than to provide the public at large with reasonable express accommodation ; and they need not in the absence of a statute furnish to all independent express companies equal facilities for doing an express business upon their passenger trains.

These cases were commenced by defendants in error as plaintiffs below to compel plaintiffs in error to give them respectively the express facilities on the several lines of railway which they had previously enjoyed by contract, and of which they had been dispossessed by notice given in accordance with the terms of the contracts. Judgments below in favor of the express companies, from which the railroad companies appealed. The causes were argued together. The case is stated in the opinion of the court.

*Mr. J. F. Dillon*, *Mr. R. J. Morgan*, *Mr. B. C. Brown* and *Mr. J. O. Broadhead* for appellants. *Mr. Sidney Bartlett* and *Mr. Wager Swayne* were with them on the brief.

*Mr. Clarence A. Seward*, *Mr. George F. Edmunds* and *Mr. John A. Campbell* for appellees. *Mr. F. E. Whitfield* was with them on the brief.

MR. CHIEF-JUSTICE WAITE delivered the opinion of the court.

These suits present substantially the same questions and may properly be considered together. They were each brought by an express company against a railway company to restrain the railway company from interfering with or disturbing in any manner the facilities theretofore afforded the express company for doing its business on the railway of the railway company.

1. *The St. Louis, Iron Mountain and Southern Railway Company.*

This suit was begun May 21, 1880, and the business of the express company is thus described in the bill :

" Your orator, the Southern Express Company, is a corporation duly created, organized, and now existing under the laws of the State of Georgia, for the purpose, and with the powers

necessary thereto, of receiving and forwarding upon railroads, steam vessels, and other vehicles of rapid transportation, in a safe and secure manner, and with the greatest practicable expedition, in the special care and custody of its own employés, and at destination personally delivering packages of money or currency, gold and silver bullion, bonds, bank notes, deeds, and other valuable papers, jewels, silks, laces, and other articles of great value, requiring for their security extraordinary care and precaution, and also parcels of goods, wares, and merchandise, requiring great dispatch or careful handling, and also fruit, vegetables, fresh meats, fish, oysters, fish spawn, and other articles liable to decay or other injury from delay; and also live animals requiring particular care and attention during transportation; and also for receiving and forwarding for collection bills, notes, drafts, and accounts, and receiving and returning payment thereof; and also for receiving and forwarding all articles of trade and commerce, with the bills and charges of the shipper thereto attached, to be collected of the consignee on delivery of such articles, and returned to shipper; and in so doing to afford the public, under a single contract, and on assured responsibility, safe, reliable, and speedy transportation from and to all points accessible only over two or more railroads, and generally to perform for the public all offices that, by usage, are incident to the class of carriers now well known, recognized and designated by the public, as 'express carriers.'"

The St. Louis, Iron Mountain and Southern Railway Company is a railway corporation existing in the States of Missouri and Arkansas, formed by the consolidation of the St. Louis and Iron Mountain Railroad Company, the Cairo and Fulton Railroad Company, and the Cairo, Arkansas and Texas Railroad Company. Its railway extends from St. Louis, and from a point on the Mississippi, opposite Cairo, through Missouri and Arkansas, by way of Little Rock, to Texarkana, on the boundary between Arkansas and Texas, with certain branches.

On the 30th of April, 1872, and before the consolidation, the St. Louis and Iron Mountain Company entered into a contract, in writing, with the Adams Express Company, by which the railroad company agreed to furnish the express company "one-

half the baggage-car on each of its passenger trains on main line and branches for carrying express freight," and also "the use of a part of the baggage-car on accommodation trains between St. Louis and Potosi to an extent not in excess of the amount allowed in passenger trains." The cars were not to be loaded with over seven thousand pounds at any one time, and the railway company agreed that each of the cars should run each way daily on the passenger trains. The company also agreed that it would "prohibit its conductors, agents, and baggage-masters from transporting on its passenger trains, or from accepting compensation for, any matter except extra baggage;" and further, that it would not "permit any person or company to do an express business on its passenger trains on any better terms, or for any less payment, than that given the Adams Express Company." In consideration of this service the express company agreed to pay $125 a day, and a proportional increase for every ten miles operated by it on an extension of the railroad, "for the transportation of its messengers with safes and package chests, and an average amount of freight not exceeding ten thousand pounds per day," and an agreed rate for all freights in excess of that amount. The express company also agreed "to carry all money and other valuables for the said railroad company to and from points on the line of its road free of charge, and for such matter as may be sent to, or received from, points off the line to charge the railroad company not exceeding two-thirds the rate charged the public." It was also stipulated that "the railroad company should be exempt and indemnified by said express company against all loss or damage to goods or money transported by said express company;" and that settlements should "be made on or before the tenth day of each month for the business of the preceding month." The contract also contained this clause: "This agreement to remain in full force one year from the 1st day of May, 1872; and thereafter until thirty days' notice shall be given by either party to the other of its desire to discontinue the same."

On the first of February, 1874, also before the consolidation, the Southern Express Company entered into a contract in writing with the Cairo and Fulton Railroad Company, and the

Cairo, Arkansas and Texas Railroad Company, by which the railroad companies agreed to furnish the express company "one-third of the room in the baggage-car on each passenger train over the Cairo and Fulton road and the Cairo, Arkansas and Texas road, for the carriage of express matter not to exceed six thousand pounds per day for each car." This contract also contained provisions similar to that between the Adams and St. Louis and Iron Mountain companies as to the regulation of the duties of conductors, agents, and baggage-masters, and the privileges of other persons for doing an express business on passenger trains. The Southern Company agreed to pay for the transportation of its messengers, with safes and package chests, and an average amount of express matter, not to exceed six thousand pounds per car, $50 a day to the Cairo and Fulton Company, and $10 a day to the Cairo, Arkansas and Texas Company, and an agreed rate for all excess over six thousand pounds. There were also other provisions as to the carriage of money packages and valuables by the express company for the railroad companies, and as to the details of the business, at the end of which was the following: "This contract to remain in force until terminated on either party giving the other sixty days' notice of its intention to thus withdraw therefrom."

The consolidation took place May 16, 1874, and the two express companies continued their business upon the road under their respective contracts until April 1, 1878, when the Adams Company, with the assent and permission of the consolidated railway company, relinquished its business on the line to the Southern Company, and that company thereafter conducted the whole express business on the entire line under the two contracts.

On the 26th of March, 1880, the railroad company having come to the conclusion to change the mode of doing the express business over its line, gave the express company the stipulated notice for a termination of the existing contracts. All efforts by the express company to secure facilities for a continuation of its business over the road having failed, this suit was brought, and the prayer of the bill is:

"1. That during the pendency of this suit the defendant, its

officers, agents, servants and employés may be restrained and enjoined by a proper preliminary or provisional order or injunction, and until the further order of the court, from interfering in any manner with or disturbing in any manner the enjoyment by the Southern Express Company of the facilities now accorded to it by the said defendant, upon its lines of railway, for the transaction of the business of the said Southern Express Company, and of the express business of the public confided to its care; and from interfering with any of the express matter or messengers of the Southern Express Company; and from excluding or ejecting any of its express matter or messengers from the depots, cars, and lines of the said defendant, as the same have been heretofore and are now enjoyed and occupied by the said Southern Express Company; and from refusing to receive and transport, in like manner as the said defendant is now doing, over its lines of railway, the express matter and messengers of the said Southern Express Company; and from interfering with or disturbing the business of the said Southern Express Company, or its present relations, in reference thereto, with the said defendant in any way or manner whatsoever, and so long as the said Southern Express Company shall be willing and ready, and offer to pay, according to all legal rates therefor.

"2. That if any dispute or disagreement shall arise between the parties hereto during the pendency of this suit, and before a final decree herein upon the question of what is a lawful or reasonable compensation to be paid by your orator to the defendant for the transportation of express matter, your orator may be permitted to bring the same by way of interlocutory application to this court for its decision, and that, pending the inquiry thereon, the preliminary injunction heretofore prayed may be continued to the same purport, tenor, and effect as if the prayer for the same were here repeated.

"3. That the said defendant may be decreed by this court to transport at all times the express matter, safes, and messengers of the said Southern Express Company by the same trains and with the same accommodations thereon, and in its depots and stations as it may transport its own express matter or as it may accord to itself; and that the said defendant may be decreed

so to transport the said express matter, safes, and messengers of the said Southern Express Company, at and for the statutory tolls and compensation in that behalf by law provided; and that the said defendant may be decreed to make a reasonable rebate or reduction, to be fixed and determined by this honorable court, from its charges to the said Southern Express Company by reason of its performance of said accessorial service, as above specified, so long as the said Southern Express Company shall offer to conform to all the reasonable rules and regulations of the said defendant, and to pay all lawful charges for the transaction of its said business.

"4. That a permanent injunction may issue herein to the same purport and effect as is hereinbefore prayed in regard to said provisional or preliminary injunction.

"5. That your orator may have such other relief or such further or different relief herein, with its costs, as to the court may seem meet."

The railway company answered the bill, and, among other things, as follows:

"38. Defendant further avers that it does not claim and never has claimed a right to exclude the transportation of the express matter of the complainant from the lines of defendant's railway, and has always been willing and is now willing to carry and transport any freight or express matter of complainant that it may offer to defendant. Defendant claims the right to carry and transport what is called express matter in the spaces in its express cars selected by itself, and under the supervision, care, and control of its own employés, and has refused and does refuse to complainant the right to have allotted to itself any particular space in defendant's express cars for its exclusive use, or to permit its messengers to ride in the express cars and to take charge of complainant's express freight."

2. *The Memphis and Little Rock Railroad Company.*

This suit was begun by the same express company on the 11th of June, 1880. The Memphis and Little Rock Railroad Company is a railroad corporation formed by the reoganization of a former corporation of the same name, owning and operat-

ing a railroad in Arkansas, between Little Rock and a point on the Mississippi River opposite Memphis. On the 26th of May, 1871, before the reorganization, and while the railroad of the present company was owned and operated by the original corporation, that corporation entered into a written contract with the Southern Express Company, by which the railroad company was to furnish the express company with one end of a baggage-car for express service when convenient, and, if not, a box car. For this the express company was to pay for each hundred pounds of freight carried at certain agreed rates, and to assume all risks of the transportation of express matter, except such damage as arose from the gross neglect or carelessness of the railroad company. This agreement also contained other stipulations for the regulation of the conduct of the parties under it, and at the end was this: " This agreement takes effect June 1, 1871, and may be terminated by either party on thirty days' notice." After the reorganization no new contract was made, but the express company continued business on the road under the old contract, without objection by the reorganized company, until June 2, 1880, when it was notified that, as the railroad company had " determined to transport all express matter and transact all express business on its own account, and through and by its own officers and agents on and after the fourteenth of June," all contracts or arrangements existing between the companies would terminate on that day. The notice concluded as follows: " We shall be glad to receive, transport, and deliver any express matter you or your company may think proper to entrust to us at reasonable rates and in conformity to law." This suit was brought in consequence of that notice, and the prayer of the bill is substantially like that against the St. Louis, Iron Mountain and Southern Company.

This company also answered the bill, and, among other things, is the following:

" It says that the fact is that when it purchased the road it now operates, May 1, 1877, it found complainant on the road with all its investments made and its agencies and business routes established; and that respondent tacitly permitted complainant to continue its business over its road. But it is now

able, ready and willing to do the express carrying business over its road for itself, and for the benefit of its own stockholders, and desiring to take the business into its own hands it gave complainant the notice mentioned and copied in the bill. It repeats here what it said in that notice, that it is ready and willing to carry for complainant in the same manner and upon the same terms that it carries for all other shippers. It submits that this is the extent of its duty toward complainant, and no injunction of this court is necessary to compel it to discharge that duty. It submits that complainant has no privilege or right which is not common to all shippers, and it repeats that what it does for others it will freely and in its proper order do for complainant. None of the privileges claimed by complainant are accorded by respondent to any other shipper, and no other even asks such privileges. Respondent denies that it must give complainant the same privileges or facilities that it enjoys itself, for that would be to surrender to complainant a part of its corporate rights and privileges, and also to surrender to complainant the control of a part of its cars and business. All that it is required to do for complainant is to receive and carry for it in the same manner and at the same rates it does for others. In the conduct of its business, express and all other, it receives freights from the shippers, giving therefor a receipt or bill of lading, takes the freight into its own possession, loads it itself into its cars, carries it in its own custody, and at the place of destination delivers it to the consignee. All this it is willing, has offered, and again offers, to do for complainant."

### 3. The Missouri, Kansas and Texas Railway Company.

This suit was brought on the 28th of December, 1880, by or on behalf of the Adams Express Company, a joint stock association of the State of New York, organized in 1854. The Missouri, Kansas and Texas Railway Company is a Kansas railroad corporation, owning and controlling lines of railroad from Junction City, Kansas, and Sedalia, Missouri, to Parsons, Kansas, thence southerly to a crossing of the Arkansas River; and from Holden, Missouri, on the Missouri Pacific Railroad, westerly to

Paoli, on the Missouri River,, Fort Scott and Gulf Railroad, in all a length of say four hundred and seventy-three miles.

The bill in this case contains, among others, the following averments:

" X. After the formation of the Adams Express Company various other express companies were formed for the conduct of the same general business, to be operated in like manner over the public thoroughfares of the country. As the principal railway lines known as 'Trunk Lines' and running in a general direction from east to west, ran in courses generally parallel, the principal express companies existing at the early date aforesaid, namely, the 'Adams,' the 'American,' and the ' United States,' agreed among themselves that they would reach the commercial centres of the country by different railway and steamboat routes, and that they would divide the north and south express business in a manner best calculated for the welfare thereof, and for the best service of the public.

" This understanding was generally effectuated, but in various instances two express companies have, at the same time, and with permission of the railway company, occupied, for a greater or less distance, the same line of railway, and such occupation has not been found incompatible with the harmonious working of such two express companies, and has resulted in a larger income to the railway company than it would have received had its line been occupied but by one express company only, and has also afforded the public the opportunity, both upon short and long routes, for the most efficient service and for the competition to which it is lawfully entitled.

" XI. Under the mutual understanding aforesaid the Adams Express Company, as soon as the demands of the public warranted the expenditure, extended its business westward to the cities of Wheeling, Columbus, Cincinnati, Indianapolis, Louisville, and St. Louis, by means of the facilities afforded by the Pittsburg, Cincinnati, and St. Louis Railroad and other companies, and thereby made the routes of the said Adams Express Company continuous from Boston, New York, Philadelphia, and Pittsburg to the cities last aforesaid, and such continuous routes are now operated by it.

"XII. The said Adams Express Company, under the arrangements and understandings aforesaid, extended its business in a southerly direction, and, as the word 'express' imports, always by the shortest line of communication to all the principal cities in the South—namely, Richmond, Charleston, Savannah, Mobile, Montgomery, New Orleans, Memphis, and other places—and in so doing was always afforded by those occupying the public office of a common carrier all necessary facilities therefor, and which facilities were by said carriers increased to the said Adams Express Company in proportion with the increase of the demands of the public therefor.

"XIII. The Adams Express Company has always, in the conduct of its business, paid, and now pays to the common carriers whom it employs a just and reasonable compensation, satisfactory to them, for the facilities afforded, and has itself always charged the public only a just and reasonable compensation for the express services performed for it.

"XIV. In the conduct of its business, as aforesaid, the Adams Express Company has always represented, and now represents, that portion of the public which desires to avail itself, in the transmission of its property and valuables, of the pecuniary responsibility of the express company, and of the safeguards and checks which it has originated, provided, and enforced for the safe custody of the property committed to its care.

"XV. The Adams Express Company conducted its business, as aforesaid, until the commencement of hostilities, in 1861, when, by reason of the derangements of commercial intercourse then ensuing, and for other controlling reasons of a public character then generally known, it was obliged to discontinue its organization and business in the Southern States, and it thereupon withdrew from the same, and sold so much of its good-will and its equipment as then there existed to the Southern Express Company, a corporation created, as this plaintiff is informed and believes, under and pursuant to the laws of the State of Georgia; and since then the express business in the principal Southern States has been, and is now, conducted by the said Southern Express Company, under said charter, by which it is expressly authorized to conduct the same, and which said charter gives a leg-

islative description of the kind and character of business to be
done by said company as an express company, and to a copy
of which the plaintiff craves leave to refer.

" XVI. After the cessation of the hostilities aforesaid an ar-
rangement was made, and which is now in force, between the
said Adams' Express Company and the said Southern Express
Company, for the general regulation of the transportation of
property coming from the territory of the one into the territory
of the other, and by which property received by the Adams
Express Company, destined for points within the territory of
the Southern, and property received within the territory of the
Southern, destined to points within the territory of the Adams
Express Company, or reached by its connections, is inter-
changed at certain specified points, and upon a basis of charge
proportioned to the distance traversed in the territory of either.
In case of such interchange of express matter within such ter-
ritory the express company originally receiving the same re-
mains liable to the public for the value thereof, until delivered
to the consignee.

" XVII. Since the said understanding and arrangement, the
Adams Express Company has made such interchanges with the
said Southern Express Company; and now makes the same, at
Richmond, Lynchburg, and Danville, Virginia; Chattanooga,
Tennessee; Cairo, Illinois, and Paducah, Kentucky, and has
not, itself, since then either delivered or received express mat-
ter directly south of such points, but the territory so directly
south thereof has been operated by the said Southern Express
Company alone."

On the 23d of November, 1871, the Adams Express Com-
pany and the Missouri, Kansas and Texas Company entered
into the following contract:

" This agreement, made this twenty-third day of November,
A.D. 1871, between Missouri, Kansas and Texas Railway Com-
pany, by R. S. Stevens, its general manager, party of the first
part, and the Adams Express Company, by ——— ———,
party of the second part, witnesseth:

*     *     *     *     *     *

" 1. The Missouri, Kansas and Texas Railway Company will

furnish for the use of the Adams Express Company one car each way on its line from Sedalia, Missouri, *via* Parsons, Kansas, to Junction City, Kansas, to be hauled on a passenger train each day that a passenger train is to run over the line. The car to be used exclusively by the Adams Express Company, but not to carry at any one time an excess of seven tons of freight; the charges by the express company to its patrons to be not less than one and one-half first-class rates of the Missouri, Kansas and Texas Railway Company at the time, as per its freight tariff. The railway company will also furnish from Parsons south to the Arkansas River the necessary accommodations in its baggage-car, and also similar accommodations in a baggage-car on the Holden line on one train each way. The express car, as well as all express matter carried over the road in any baggage or other car, to be in charge of one agent or messenger of the express company on each train, who is to be carried free.

"2. All express matter from points on or north of the Missouri Pacific Railroad, and all that comes from any point beyond or east of St. Louis, *via* that city, for points on the line of the Missouri, Kansas and Texas Railway or beyond, is to be brought on the said line at Sedalia, and no business for this road is to be done, or freight of any kind to be received or delivered, at Vinita, except such as originated at or is destined to points on the Atlantic and Pacific Railroad south and west from Franklin, Missouri.

"3. As part compensation to the railway company for the privileges furnished by it, as herein provided, the express company will pay to the railway company monthly one hundred dollars per day for each and every day that trains are run over the railway or any part thereof.

"4. As part consideration, it is also agreed that the express company shall carry the money and valuable packages belonging to the railway company over the line of the Missouri, Kansas and Texas Railway free of charge, and for all matter going to or coming from points beyond the line of the Missouri, Kansas and Texas Railway, the express company will charge not exceeding two-thirds of its regular rate for such business. The

superintendents and agents for said express company, whenever it is necessary to supervise the business, to have the privilege of travelling over the line of said road free; passes for such free passage to be furnished on application of the superintendent of the express company for this division.

"5. The railway company agree, further, that they will not carry freight or packages for pay in their baggage-cars on passenger trains, nor allow their conductors or baggage-masters or other employés to do so, during the existence of this agreement, nor will they allow any other company, firm, or person the privilege of carrying freight on their passenger trains at any less rate of payment per day, or any greater weight in a car, or upon any better terms in any way than is granted to said express company under this agreement.

"6. It is understood that as the line of the Missouri, Kansas and Texas Railway is extended south from the Arkansas River, similar accommodations will be furnished for an express business, as herein above provided, at a reasonably increased cost, to be paid by the express company, as shall hereafter be agreed upon.

"7. This agreement to take effect on the first day of December, A.D. 1871, and continue in force for one year thereafter, and until thirty days' notice shall have been given to the other by the party desiring to terminate same."

Under this contract the Adams Company carried on its business over the railroad line, without objection from the railroad company, until December 1, 1880, when the railroad company notified the express company that it would be expected to retire from the operation of its business on that road January 1, 1881, as on and after that date the business would be done by or for the railroad company. This suit was brought after the service of that notice, and the prayer of the bill is substantially like that in the other cases.

The railroad company at first answered the bill, and testimony was taken, but before a final hearing the answer was withdrawn and a demurrer substituted.

In each of the cases a preliminary injunction was granted, and from that time until now the express companies have occu-

pied the roads the same as before the suits, but in connection with the railroad companies, as carriers of express matter, or with some other express company to which the privilege of doing an express business over the line had been granted by the railroad company.

A large amount of testimony was taken, and on the final hearing a decree was entered in each of the cases, one of which is as follows:

"I. That the express business, as fully described and shown in the record, is a branch of the carrying trade that has by the necessities of commerce and the usages of those engaged in transportation become known and recognized so as to require the court to take notice of the same as distinct from the ordinary transportation of the large mass of freight usually carried on steamboats and railroads.

"II. That it has become the law and usage, and is one of the necessities of the express business, that the property confided to an express company for transportation should be kept while in transit in the immediate charge of the messenger or agent of such express company.

"III. That to refuse permission to such messengers or agents to accompany such property on the steamboats or railroads on which it is to be carried, and to deny to them the right to the custody of the property while so carried, would be destructive of the express business and of the rights which the public have to the use of such steamboats and railroads for the transportation of such property so under the control of such messengers or agents.

"IV. That the defendant, its officers, agents, and servants, have no right to open or inspect any of the packages or express matter which may be offered to it for transportation by the plaintiff's company, or to demand a knowledge of the contents thereof, nor to refuse transportation thereof unless such inspection be granted or such knowledge be afforded.

"V. That it is the duty of the defendant to carry the express matter of the plaintiff's company and the messengers or agents in charge thereof at a just and reasonable rate of compensation, and that such rate of compensation is to be found and

established as a unit, and is to include as well the transportation of such messengers or agents as of the express matter in their custody and under their control.

"VI. That on and subsequent to the 1st day of May, 1877, the said defendant afforded to the said plaintiff all the facilities needed by it for the conduct of its express business over the defendant's lines, and such as are specifically in the bill herein set forth; that thereafter the defendant notified the plaintiff that such facilities would be withdrawn; and that it was the intention and purpose of the defendant to exclude the plaintiff's company from its lines on and after the 21st day of June, 1880; that such intention and purpose were restrained by the preliminary injunction order of the court, which said injunction order was afterwards modified, as appears in the record.

"VII. That it is the duty of the defendant to afford to the plaintiff all express facilities, and to the same extent and upon the same trains that said defendant may accord to itself or to any other company or corporation engaged in the conduct of an express business on the defendant's lines, and to afford the same facilities to the plaintiff on all its passenger trains.

"VIII. That the plaintiff keep and render monthly a true account of the services performed for it by defendant, and pay therefor at the rate hereinafter specified, on or before the ——— of each month, after the date hereof, for the business of the month preceding; and that the defendant has no right to require prepayment for said express facilities, or payment therefor at the end of every train, or in any other manner than as is herein provided; and that plaintiff execute and deliver to the defendant a bond in the sum of twenty-five thousand dollars, conditioned well and faithfully to make such payments as are herein provided, and with surety to be approved by a judge of the court.

"IX. That it is and was the duty of said defendant to afford, and to have afforded, such facilities to the plaintiff as herein specified, for a just and reasonable compensation.

"X. Whereas it is alleged by complainant that since the commencement of this suit and the service of the preliminary order of injunction herein, the defendant has, in violation of

said injunction and of the rights of complainant, made unjust discriminations against complainant, and has charged complainant unjust and unreasonable rates for carrying express matter; therefore, it is ordered that complainant have leave hereafter to apply for an investigation of these and similar allegations, and for such order with respect thereto as the facts, when ascertained, may justify, and for the appointment of a master to take proof and report thereon.

"XI. That the defendant, its officers, agents, servants, and employés, and all persons acting under their authority, be, and they hereby are, permanently and perpetually enjoined and restrained from interfering with or disturbing in any manner the enjoyment by the plaintiff of the facilities provided for in this decree, to be accorded to it by the said defendant upon its lines of railway, or such as have been heretofore accorded to it for the transaction of the business of the plaintiff, and of the express business of the public confided to its care; and from interfering with any of the express matter or messengers of the plaintiff; and from excluding or ejecting any of its express matter or messengers from the depots, trains, cars, or lines of the said defendant, as the same are by this decree directed to be permitted to be enjoyed and occupied by the said plaintiff; and from refusing to receive and transport in like manner as the said defendant is now transporting, or as it may hereafter transport, for itself or for any other express company, over its lines of railway, the express matter and messengers of the said plaintiff; and from interfering with or disturbing the business of the said plaintiff in any way or manner whatsoever, the said plaintiff paying for the services performed for it by the defendant monthly, as herein prescribed, at a rate not exceeding fifty per centum more than its prescribed rates for the transportation of ordinary freight, and not exceeding the rate at which it may itself transport express matter on its own account, or for any other express or other corporation or for private individuals, reserving to either party the right at any time hereafter to apply to this court according to the rules in equity proceedings for a modification of this decree as to the measure of compensation herein prescribed.

"XII. It is further ordered, adjudged, and decreed that defendant pay the costs to be taxed herein, and that an execution or a fee bill issue therefor. And the said defendant enters herein its prayer for appeal, which prayer is granted."

The decrees in the other cases differ from this only in matters of detail.

The cases are now here for review on these appeals.

The evidence shows that the express business was first organized in the United States about the year 1839. The case of *New Jersey Steam Navigation Company* v. *Merchants' Bank*, 6 How. 344, grew out of a loss by the burning of the steamboat Lexington on Long Island Sound in January, 1840, of $18,000 in gold and silver coin, while in charge of Wm. F. Harnden, an express carrier, for transportation from New York to Boston. In the report of this case is found a copy of one of the earliest advertisements of the express business as published in two of the Boston newspapers in July, 1839. It is as follows:

"Boston and New York Express Package Car.—Notice to Merchants, Brokers, Booksellers, and all Business Men.

"Wm. F. Harnden, having made arrangements with the New York and Boston Transportation and Stonington and Providence Railroad Companies, will run a car through from Boston to New York and *vice versa*, via Stonington, with the mail train daily, for the purpose of transporting specie, small packages of goods, and bundles of all kinds. Packages sent by this line will be delivered on the following morning, at any part of the city, free of charge. A responsible agent will accompany the car, who will attend to purchasing goods, collecting drafts, notes and bills, and will transact any other business that may be intrusted to him.

"Packages for Philadelphia, Baltimore, Washington, New Haven, Hartford, Albany and Troy will be forwarded immediately on arrival in New York.

"N. B.—Wm. F. Harnden is alone responsible for any loss or injury of any articles or property committed to his care; nor is any risk assumed by, or can any be attached to, the Boston and New York Transportation Company, in whose

steamers his crates are to be transported, in respect to it or its contents at any time."

The report also contains a copy of the contract between. Harnden and the New Jersey Steam Navigation Company, the owner of the Lexington, dated the 1st of August, 1839, for the facilities to be afforded Harnden for his business on the steamers of that company. This contract was similar to one made a short time before with the Boston and New York Transportation Company, a company which became merged in the New Jersey Steam Navigation Company August 1, 1839, and it provided that Harnden, in consideration of $250 per month, was to have the privilege of transporting in the steamers of the company between New York and Providence, via Newport and Stonington, not to exceed once each day from New York and from Providence, " one wooden crate of the dimensions of five feet by five feet in width and height, and six feet in length, (contents unknown)." It was also stipulated and agreed that " the said crate, with its contents, is to be at all times exclusively at the risk of the said William F. Harnden ; and the said New Jersey Steam Navigation Company will not, in any event, be responsible either to him or his employers for the loss of any goods, wares, merchandise, notes, bills, evidences of debt, or property of any and every description, to be conveyed or transported by him in said crate, or otherwise, in any manner, in the boats of the said company." It was also further provided that Harnden should attach to all his advertisements for business, and to his bills of lading, notices in the form of that at the foot of his advertisement, a copy of which is given above, and that he should not violate any of the provisions of the post office laws, or interfere with the Navigation Company in its transportation of letters or papers, or carry powder, matches, or other combustible materials of any kind calculated to endanger the safety of the boats or the property or persons on board. At the end was this clause : " And that this contract may be at any time terminated by the New Jersey Steam Navigation Company, or by the said Harnden, upon one month's notice given in writing."

Such was the beginning of the express business which now has grown to an enormous size, and is carried on all over the United States and in Canada, and has been extended to Europe and the West Indies. It has become a public necessity, and ranks in importance with the mails and with the telegraph. It employs for the purposes of transportation all the important railroads in the United States, and a new road is rarely opened to the public without being equipped in some form with express facilities. It is used in almost every conceivable way, and for almost every conceivable purpose, by the people and by the government. All have become accustomed to it, and it cannot be taken away without breaking up many of the long settled habits of business, and interfering materially with the conveniences of social life.

In this connection it is to be kept in mind that neither of the railroad companies involved in these suits is attempting to deprive the general public of the advantages of an express business over its road. The controversy, in each case is not with the public, but with a single express company. And the real question is not whether the railroad companies are authorized by law to do an express business themselves; nor whether they must carry express matter for the public on their passenger trains, in the immediate charge of some person specially appointed for that purpose; nor whether they shall carry express freights for express companies as they carry like freights for the general public; but whether it is their duty to furnish the Adams Company or the Southern Company facilities for doing an express business upon their roads the same in all respects as those they provide for themselves or afford to any other express company.

When the business began railroads were in their infancy. They were few in number, and for comparatively short distances. There has never been a time, however, since the express business was started that it has not been encouraged by the railroad companies, and it is no doubt true, as alleged in each of the bills filed in these cases, that " no railroad company in the United States . . . has ever refused to transport express matter for the public, upon the application of some ex-

press company, of some form of legal constitution. Every railway company . . . has recognized the right of the public to demand transportation by the railway facilities which the public has permitted to be created, of that class of matter which is known as express matter." Express companies have undoubtedly invested their capital and built up their business in the hope and expectation of securing and keeping for themselves such railway facilities as they needed, and railroad companies have likewise relied upon the express business as one of their important sources of income.

But it is neither averred in the bills, nor shown by the testimony, that any railroad company in the United States has ever held itself out as a common carrier of express companies, that is to say, as a common carrier of common carriers. On the contrary it has been shown, and in fact it was conceded upon the argument, that, down to the time of bringing these suits, no railroad company had taken an express company on its road for business except under some special contract, verbal or written, and generally written, in which the rights and the duties of the respective parties were carefully fixed and defined. These contracts, as is seen by those in these records, vary necessarily in their details, according to the varying circumstances of each particular case, and according to the judgment and discretion of the parties immediately concerned. It also appears that, with very few exceptions, only one express company has been allowed by a railroad company to do business on its road at the same time. In some of the States, statutes have been passed which, either in express terms or by judical interpretation, require railroad companies to furnish equal facilities to all express companies, Gen. Laws N. H., 1878, ch. 163, § 2; Rev. Stat. Maine, 1883, 494, ch. 51, § 134; but these are of comparative recent origin, and thus far seem not to have been generally adopted.

In Missouri, by the Constitution, railways are " declared public highways, and railroad companies common carriers." The general assembly is also required " to pass laws to correct abuses and prevent unjust discrimination and extortion in rates of freight and passenger tariffs on the different railroads in

this State," and "to pass laws establishing reasonable maximum rates of charges for the transportation of passengers and freight on said railroads, and enforce all such laws by adequate penalties." Art. XII., sec. 14. And by section 23 it is provided that "no discrimination in charges or facilities in transportation shall be made between transportation companies and individuals, or in favor of either, by abatement, drawback, or otherwise, and no railroad company, or any lessee, manager, or employé thereof shall make any preference in furnishing cars or motive power." We have not been referred to any statute of the State which does more than reproduce these constitutional provisions in substantially the same general language.

Art. XVII., sec. 1, of the Constitution of Arkansas provides that "all railroads, canals and turnpikes shall be public highways, and all railroad and canal companies shall be common carriers." Sections 3, 5 and 6 of the same article are as follows:

"SEC. 3. All individuals, associations and corporations shall have equal rights to have persons and property transported over railroads, canals and turnpikes, and no undue or unreasonable discrimination shall be made in charges for, or in facilities for transportation of freight or passengers within the State, or coming from or going to any other State."

"SEC. 5. No president, director, officer, agent, or employé of any railroad or canal company shall be interested, directly or indirectly, in the furnishing of material or supplies to such company, or in the business of a common carrier of freight or passengers over the works owned, leased, controlled, or worked by such company, nor in any arrangement which shall afford more advantageous terms or greater facilities than are offered or accorded to the public.

"SEC. 6. No discrimination in charge or facilities for transportation shall be made between transportation companies and individuals, nor in favor of either, by abatement, drawback, or otherwise; and no railroad or canal company, or any lessee, manager, or employé thereof, shall make any preference in furnishing cars or motive power."

The legislation of this State has not, so far as we have been advised, extended the operation of these constitutional provisions in a way to affect the questions now to be decided.

In Kansas the following statute is in force:

"SEC. 55. Every railway corporation in this State which now is, or may hereafter be, engaged in the transportation of persons or property, shall give public notice of the regular time of starting and running its cars, and shall furnish sufficient accommodations for the transportation of all such passengers, baggage, mails, and express freight as shall, within a reasonable time previous thereto, be offered for transportation at the place of starting, at the junction of other roads, and at the several stopping-places; and they are hereby required to stop all trains carrying passengers at the junction or intersection of other railways a sufficient length of time to allow the transfer of passengers, personal baggage, mails, and express freight from the trains or railways so connecting or intersecting, or they may mutually arrange for the transportation of such persons and property over both roads without change of cars; and they shall be compelled to receive all passengers and freight from such connecting and intersecting roads whenever the same shall be delivered to them." Comp. Laws Kansas, 1879, 225, ch. 23.

The reason is obvious why special contracts in reference to this business are necessary. The transportation required is of a kind which must, if possible, be had for the most part on passenger trains. It requires not only speed, but reasonable certainty as to the quantity that will be carried at any one time. As the things carried are to be kept in the personal custody of the messenger or other employé of the express company, it is important that a certain amount of car space should be specially set apart for the business, and that this should, as far as practicable, be put in the exclusive possession of the express man in charge. As the business to be done is "express," it implies access to the train for loading at the latest, and for unloading at the earliest, convenient moment. All this is entirely inconsistent with the idea of an express business on passenger trains free to all express carriers. Railroad companies are by law

carriers of both persons and property. Passenger trains have from the beginning been provided for the transportation primarily of passengers and their baggage. This must be done with reasonable promptness and with reasonable comfort to the passenger. The express business on passenger trains is in a degree subordinate to the passenger business, and it is consequently the duty of a railroad company in arranging for the express to see that there is as little interference as possible with the wants of passengers. This implies a special understanding and agreement as to the amount of car space that will be afforded, and the conditions on which it is to be occupied, the particular trains that can be used, the places at which they shall stop, the price to be paid, and all the varying details of a business which is to be adjusted between two public servants, so that each can perform in the best manner its own particular duties. All this must necessarily be a matter of bargain, and it by no means follows that, because a railroad company can serve one express company in one way, it can as well serve another company in the same way, and still perform its other obligations to the public in a satisfactory manner. The car space that can be given to the express business on a passenger train is, to a certain extent, limited, and, as has been seen, that which is allotted to a particular carrier must be, in a measure, under his exclusive control. No express company can do a successful business unless it is at all times reasonably sure of the means it requires for transportation. On important lines one company will at times fill all the space the railroad company can well allow for the business. If this space had to be divided among several companies, there might be occasions when the public would be put to inconvenience by delays which could otherwise be avoided. So long as the public are served to their reasonable satisfaction, it is a matter of no importance who serves them. The railroad company performs its whole duty to the public at large and to each individual when it affords the public all reasonable express accommodations. If this is done the railroad company owes no duty to the public as to the particular agencies it shall select for that purpose. The public require the carriage, but the company may choose its own ap-

propriate means of carriage, always provided they are such as to insure reasonable promptness and security.

The inconvenience that would come from allowing more than one express company on a railroad at the same time was apparently so well understood both by the express companies and the railroad companies that the three principal express companies, the Adams, the American, and the United States, almost immediately on their organization, now more than thirty years ago, by agreement divided the territory in the United States traversed by railroads among themselves, and since that time each has confined its own operations to the particular roads which, under this division, have been set apart for its special use. No one of these companies has ever interfered with the other, and each has worked its allotted territory, always extending its lines in the agreed directions as circumstances would permit. At the beginning of the late civil war the Adams Company gave up its territory in the Southern States to the Southern Company, and since then the Adams and the Southern have occupied, under arrangements between themselves, that part of the ground originally assigned to the Adams alone. In this way these three or four important and influential companies were able substantially to control, from 1854 until about the time of the bringing of these suits, all the railway express business in the United States, except upon the Pacific roads and in certain comparatively limited localities. In fact, as is stated in the argument for the express companies, the Adams was occupying when these suits were brought, one hundred and fifty-five railroads, with a mileage of 21,216 miles, the American two hundred roads, with a mileage of 28,000 miles, and the Southern ninety-five roads, with a mileage of 10,000 miles. Through their business arrangements with each other, and with other connecting lines, they have been able for a long time to receive and contract for the delivery of any package committed to their charge at almost any place of importance in the United States and in Canada, and even at some places in Europe and the West Indies. They have invested millions of dollars in their business, and have secured public confidence to such a degree that they are trusted unhesitat-

ingly by all who need their services. The good will of their business is of very great value if they can keep their present facilities for transportation. The longer their lines and the more favorable their connections, the greater will be their own profits, and the better their means of serving the public. In making their investments and in extending their business, they have undoubtedly relied on securing and keeping favorable railroad transportation, and in this they were encouraged by the apparent willingness of railroad companies to accommodate them; but the fact still remains that they have never been allowed to do business on any road except under a special contract, and that as a rule only one express company has been admitted on a road at the same time.

The territory traversed by the railroads involved in the present suits is part of that allotted in the division between the express companies to the Adams and Southern companies, and in due time after the roads were built these companies contracted with the railroad companies for the privileges of an express business. The contracts were all in writing, in which the rights of the respective parties were clearly defined, and there is now no dispute about what they were. Each contract contained a provision for its termination by either party on notice. That notice has been given in all the cases by the railroad companies, and the express companies now sue for relief. Clearly this cannot be afforded by keeping the contracts in force, for both parties have agreed that they may be terminated at any time by either party on notice; nor by making new contracts, because that is not within the scope of judicial power.

The exact question, then, is whether these express companies can now demand as a right what they have heretofore had only as by permission. That depends, as is conceded, on whether all railroad companies are now by law charged with the duty of carrying all express companies in the way that express carriers when taken are usually carried, just as they are with the duty of carrying all passengers and freights when offered in the way that passengers and freight are carried. The contracts which these companies once had are now out of

the way, and the companies at this time possess no other rights than such as belong to any other company or person wishing to do an express business upon these roads. If they are entitled to the relief they ask it is because it is the duty of the railroad companies to furnish express facilities to all alike who demand them.

The constitutions and the laws of the States in which the roads are situated place the companies that own and operate them on the footing of common carriers, but there is nothing which in positive terms requires a railroad company to carry all express companies in the way that under some circumstances they may be able without inconvenience to carry one company. In Kansas, the Missouri, Kansas and Texas Company must furnish sufficient accommodations for the transportation of all such express freight as may be offered, and in each of the States of Missouri, Arkansas and Kansas railroad companies are probably prohibited from making unreasonable discriminations in their business as carriers, but this is all.

Such being the case, the right of the express companies to a decree depends upon their showing the existence of a usage, having the force of law in the express business, which requires railroad companies to carry all express companies on their passenger trains as express carriers are usually carried. It is not enough to establish a usage to carry some express company, or to furnish the public in some way with the advantages of an express business over the road. The question is not whether these railroad companies must furnish the general public with reasonable express facilities, but whether they must carry these particular express carriers for the purpose of enabling them to do an express business over the lines.

In all these voluminous records there is not a syllable of evidence to show a usage for the carriage of express companies on the passenger trains of railroads unless specially contracted for. While it has uniformly been the habit of railroad companies to arrange, at the earliest practicable moment, to take one express company on some or all of their passenger trains, or to provide some other way of doing an express business on their lines, it has never been the practice to grant such a privilege to more

than one company at the same time, unless a statute or some special circumstances made it necessary or desirable. The express companies that bring these suits are certainly in no situation to claim a usage in their favor on these particular roads, because their entry was originally under special contracts, and no other companies have ever been admitted except by agreement. By the terms of their contracts they agreed that all their contract rights on the roads should be terminated at the will of the railroad company. They were willing to begin and to expand their business upon this understanding, and with this uncertainty as to the duration of their privileges. The stoppage of their facilities was one of the risks they assumed when they accepted their contracts, and made their investments under them. If the general public were complaining because the railroad companies refused to carry express matter themselves on their passenger trains, or to allow it to be carried by others, different questions would be presented. As it is, we have only to decide whether these particular express companies must be carried notwithstanding the termination of their special contract rights.

The difficulty in the cases is apparent from the form of the decrees. As express companies had always been carried by railroad companies under special contracts, which established the duty of the railroad company upon the one side, and fixed the liability of the express company on the other, the court, in decreeing the carriage, was substantially compelled to make for the parties such a contract for the business as in its opinion they ought to have made for themselves. Having found that the railroad company should furnish the express company with facilities for business, it had to define what those facilities must be, and it did so by declaring that they should be furnished to the same extent and upon the same trains that the company accorded to itself or to any other company engaged in conducting an express business on its line. It then prescribed the time and manner of making the payment for the facilities and how the payment should be secured, as well as how it should be measured. Thus, by the decrees, these railroad companies are compelled to carry these express companies

at these rates, and on these terms, so long as they ask to be carried, no matter what other express companies pay for the same facilities or what such facilities may, for the time being, be reasonably worth, unless the court sees fit, under the power reserved for that purpose, on the application of either of the parties, to change the measure of compensation. In this way as it seems to us, "the court has made an arrangement for the business intercourse of these companies, such as, in its opinion, they ought to have made for themselves," and that, we said in *Atchison, Topeka and Santa Fé Railroad Co.* v. *Denver & New Orleans Railroad Co.,* 110 U. S. 667, followed at this term in *Pullman's Palace Car Co.* v. *Missouri Pacific Railway Co.,* 115 U. S. 587, could not be done. The regulation of matters of this kind is legislative in its character, not judicial. To what extent it must come, if it comes at all, from Congress, and to what extent it may come from the States, are questions we do not now undertake to decide ; but that it must come, when it does come, from some source of legislative power, we do not doubt. The legislature may impose a duty, and when imposed it will, if necessary, be enforced by the courts, but, unless a duty has been created either by usage or by contract, or by statute, the courts cannot be called on to give it effect.

> *The decree in each of the cases is reversed, and the suit is remanded, with directions to dissolve the injunction, and, after adjusting the accounts between the parties for business done while the injunctions were in force, and decreeing the payment of any amounts that may be found to be due, to dismiss the bills.*

MR. JUSTICE MILLER dissenting.

When these cases were argued before Circuit Judge McCrary and myself at St. Louis, after due consideration and consultation with him and Judge Treat, of the District Court, I announced certain propositions as the foundations on which the decrees should be rendered. These were afterwards entered in the various circuits to which the cases properly belonged, and, I believe, in strict accordance with the principles thus announced.

I am still of opinion that those principles are sound, and I repeat them here as the reasons of my dissent from the judgment of the court now pronounced in these cases.

They met the approval of Judge McCrary when they were submitted to his consideration. They were filed in the court in the following language :

"1. I am of opinion that what is known as the express business is a branch of the carrying trade that has, by the necessities of commerce and the usages of those engaged in transportation, become known and recognized.

"That, while it is not possible to give a definition in terms which will embrace all classes of articles usually so carried, and to define it with a precision of words of exclusion, the general character of the business is sufficiently known and recognized to require the court to take notice of it as distinct from the transportation of the large mass of freight, usually carried on steamboats and railroads.

"That the object of this express business is to carry small and valuable packages rapidly, in such a manner as not to subject them to the danger of loss and damage, which, to a greater or less degree, attends the transportation of heavy or bulky articles of commerce, as grain, flour, iron, ordinary merchandise, and the like.

"2. It has become law and usage, and is one of the necessities of this business, that these packages should be in the immediate charge of an agent or messenger of the person or company engaged in it, and to refuse permission to this agent to accompany these packages on steamboats or railroads on which they are carried, and to deny them the right to the control of them while so carried, is destructive of the business and of the rights which the public have to the use of the railroads in this class of transportation.

"3. I am of the opinion that when express matter is so confided to the charge of an agent or messenger, the railroad company is no longer liable to all the obligations of a common carrier, but that when loss or injury occurs, the liability depends upon the exercise of due care, skill and diligence on the part of the railroad company.

Dissenting Opinion : Miller, J.

" 4. That, under these circumstances, there does not exist on the part of the railroad company the right to open and inspect all packages so carried, especially when they have been duly closed or sealed up by their owners or by the express carrier.

" 5. I am of the opinion that it is the duty of every railroad company to provide such conveyance by special cars, or otherwise, attached to their freight and passenger trains, as are required for the safe and proper transportation of this express matter on their roads, and that the use of these facilities should be extended on equal terms to all who are actually and usually engaged in the express business.

" If the number of persons claiming the right to engage in this business at the same time, on the same road, should become oppressive, other considerations might prevail ; but until such a state of affairs is shown to be actually in existence in good faith, it is unnecessary to consider it.

" 6. This express matter and the person in charge of it should be carried by the railroad company at fair and reasonable rates of compensation ; and where the parties concerned cannot agree upon what that is, it is a question for the courts to decide.

" 7. I am of the opinion that a court of equity, in a case properly made out, has the authority to compel the railroad companies to carry this express matter, and to perform the duties in that respect which I have already indicated, and to make such orders and decrees, and to enforce them by the ordinary methods in use necessary to that end.

" 8. While I doubt the right of the court to fix in advance the precise rates which the express companies shall pay and the railroad company shall accept, I have no doubt of its right to compel the performance of the service by the railroad company, and after it is rendered, to ascertain the reasonable compensation and compel its payment.

" 9. To permit the railway company to fix upon a rate of compensation which is absolute, and insist upon the payment in advance or at the end of every train, would be to enable them to defeat the just rights of the express companies, to destroy their business, and would be a practical denial of justice.

" 10. To avoid this difficulty, I think that the court can as-

sume that the rates, or other mode of compensation heretofore existing between any such companies, are *prima facie*, reasonable and just, and can require the parties to conform to it as the business progresses, with the right to either party to keep and present an account of the business to the court at stated intervals, and claim an addition to, or rebate from, the amount paid.   And to secure the railroad companies in any sum which may be thus found due them, a bond from the express company may be required in advance.

"11. When no such arrangement has heretofore been in existence it is competent for the court to devise some mode of compensation to be paid as the business progresses, with like power of final revision on evidence, reference to master, &c.

"12. I am of opinion that neither the statutes nor constitutions of Arkansas or Missouri were intended to affect the right asserted in these cases; nor do they present any obstacle to such decrees as may enforce the right of the express companies."

Three years' reflection and the renewed and able argument in this court have not changed my belief in the soundness of these principles.

That there may be slight errors in the details of the decrees of the Circuit Courts made to secure just compensation for the services of the railroad companies is possibly true, but I have not discovered them, and the attention of the court has not been given to them in deciding this case; for holding, as it does, that the complainants were entitled to no relief whatever, it became unnecessary to consider the details of the decrees.

I only desire to add one or two observations in regard to matters found in the opinion of this court.

1. The relief sought in these cases is not sought on the ground of usage in the sense that a long course of dealing with the public has established a custom in the nature of law.   Usage is only relied on as showing that the business itself has forced its way into general recognition as one of such necessity to the public, and so distinct and marked in its character, that it is entitled to a consideration different from other modes of transportation.

2. It is said that the regulation of the duties of carrying by the railroads, and of the compensation they shall receive, is legislative in its character, and not judicial.

As to the duties of the railroad company, if they are not, as common carriers, under legal obligation to carry express matter for any one engaged in that business in the manner appropriate and usual in such business, then there is no case for the relief sought in these bills. But if they are so bound to carry, then in the absence of any legislative rule fixing their compensation I maintain that that compensation is a judicial question.

It is, then, the ordinary and ever-recurring question on a *quantum meruit*. The railroad company renders the service which, by the law of its organization, it is bound to render. The express company refuses to pay for this the price which the railroad company demands, because it believes it to be exorbitant. That it is a judicial question to determine what shall be paid for the service rendered, in the absence of an express contract, seems to me beyond doubt.

That the legislature *may*, in proper case, fix the rule or rate of compensation, I do not deny. But until this is done the court must decide it, when it becomes matter of controversy.

The opinion of the court, while showing its growth and importance, places the entire express business of the country wholly at the mercy of the railroad companies, and suggests no means by which they can be compelled to do it. According to the principles there announced, no railroad company is bound to receive or carry an express messenger or his packages. If they choose to reject him or his packages, they can throw all the business of the country back to the crude condition in which it was a half century ago, before Harnden established his local express between the large Atlantic cities; for, let it be remembered that plaintiffs have never refused to pay the railroad companies reasonable compensation for their services, but those companies refuse to carry for them at any price or under any circumstances.

I am very sure such a proposition as this will not long be acquiesced in by the great commercial interests of the country and by the public, whom both railroad companies and the

express men are intended to serve. If other courts should follow ours in this doctrine, the evils to ensue will call for other relief.

It is in view of amelioration of these great evils that, in dissenting here, I announce the principles which I earnestly believe *ought* to control the actions and the rights of these two great public services.

MR. JUSTICE FIELD dissenting.

I agree with MR. JUSTICE MILLER in the positions he has stated, although in the cases just decided I think the decrees of the courts below require modification in several particulars; they go too far. But I am clear that railroad companies are bound, as common carriers, to accommodate the public in the transportation of goods according to its necessities, and through the instrumentalities or in the mode best adapted to promote its convenience. Among these instrumentalities express companies, by the mode in which their business is conducted, are the most important and useful.

MR. JUSTICE MATTHEWS took no part in the decision of these cases.