UNITED STATES v. GEDDES.

(District Court, S. D. Ohio, E. D.  August 19, 1903.)

COMMERCE (§ 27*)—SAFETY APPLIANCE ACT—VIOLATIONS—"ENGAGED IN INTERSTATE COMMERCE."

 Safety Appliance Act Cong. March 2, 1893, c. 196, § 6, 27 Stat. 532 (U. S. Comp. St. 1901, p. 3175), as amended by Act Cong. April 1, 1896, c. 87, 29 Stat. 85, requiring common carriers "engaged in interstate commerce by railroad" to equip their cars with automatic couplers, etc., must be construed with the "Act to regulate commerce," etc., approved February 4, 1887 (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]) as thereafter amended, and known as the "Interstate Commerce Act" (Act June 29, 1906, c. 3591, 34 Stat. 584 [U. S. Comp. St. Supp. 1909, p. 1149]), which relates to "any common carrier engaged in the transportation of passengers or property wholly by railroad," etc., "under a common control, management, or arrangement, for a continuous carriage or shipment" from one state to another, such laws being part of one scheme, which is limited strictly to interstate commerce, and not intended to affect railroads operated wholly within a state independent of outside connections, and it is only when there is an arrangement with outside carriers for a continuous carriage from one state to another that the act applies; and hence, where the difference in gauge between defendant's line and that of a connecting carrier prevented a continuous carriage in the same car, and there was no through bill of lading and no conventional division of through charges, each company receiving its own charges according to its own rates, defendant was not "engaged in interstate commerce" within the meaning of the act though the goods carried were intended for shipment beyond the state.

 [Ed. Note.—For other cases, see Commerce, Cent. Dig. § 25; Dec. Dig. § 27.*

 Duty of railroad companies to furnish safe appliances, see note to Felton v. Bullard, 37 C. C. A. 8.]

Suit by the United States against one Geddes. Judgment for defendant.

See, also, 131 Fed. 452, 65 C. C. A. 320.

William F. Bundy and John M. Gitterman, for the United States. W. F. Hunter, for defendant.

THOMPSON, District Judge. This suit on behalf of the United States was brought by the United States district attorney for this district to recover penalties under section 6 of the act of Congress approved March 2, 1893 (Act March 2, 1893, c. 196, 27 Stat. 532 [U. S. Comp. St. 1901, p. 3175]), as amended April 1, 1896 (Act April 1, 1896, c. 87, 29 Stat. 85), known as the "Safety Appliance Act." It is alleged in the petition that the defendant is a common carrier, engaged in interstate commerce by railway among the several states of the Union and connecting said interstate commerce between the towns of Bellaire and Zanesville, in the state of Ohio, and it is charged that as such common carrier it used cars in interstate commerce which were not provided with the safety appliances required by said acts of Congress; and for specific violations of these acts in that respect, set forth in the petition, judgment is asked for $400.

The acts of Congress referred to must be construed in connection with the "Act to regulate commerce," etc., approved February 4, 1887 (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]), as thereafter amended, and known as the "Interstate Commerce Act" (Act June 29, 1906, c. 3591, 34 Stat. 584 [U. S. Comp. St. Supp. 1909, p. 1149]). To that act we must look in order to ascertain what is meant by the words "engaged in interstate commerce by railroad," as applied to a common carrier by the first section of the act of March 2, 1893. Manifestly the common carrier described in the act of March 2, 1893, is also the one which is more fully described in the original act as—

"any common carrier engaged in the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water when both are used, under a common control, management, or arrangement, for a continuous carriage or shipment from one state or territory of the United States or the District of Columbia to any other state or territory of the United States or the District of Columbia."

These laws are parts of one scheme and in furtherance of the same general purpose, which is limited strictly to interstate commerce and was not intended to affect railroads operated wholly within a state independent of outside connections, and it is only when there is an arrangement with outside carriers for a continuous carriage or shipment from one state or territory to another state or territory that such railroad becomes subject to the operation of these statutes.

In the case of Cincinnati, New Orleans & Texas Pacific Railway v. Interstate Commerce Commission, 162 U. S. 193, 16 Sup. Ct. 700, 704, 40 L. Ed. 935, it was said that, when goods shipped under a through bill of lading from a point in one state to a point in another are received in transit by a state common carrier under a conventional division of the charges, such carrier must be deemed to have subjected its road to an arrangement for a continuous carriage or shipment within the meaning of the act to regulate commerce. In that case it appeared that the complainants shipped their goods, at first-class rates, by through bills of lading, from Cincinnati to Atlanta, to Social Circle, and to Augusta; that through rates of $1.07 per 100 pounds were charged to both Atlanta and to Augusta, of which the Cincinnati, New Orleans & Texas Pacific Railway Company received 55.7 cents, the Western & Atlantic 22.9 cents, and the Georgia Railroad Company 28.4 cents. Social Circle is a local station on the Georgia Railroad, 52 miles east of Atlanta, and 119 miles west of Augusta. When goods were shipped to Social Circle, the complainants had to pay $1.07 per 100 pounds, of which 75.9 cents went to the Cincinnati, New Orleans & Texas Pacific Company, 31.1 to the Western & Atlantic, and 30 cents to the Georgia; the said amount of 30 cents per 100 pounds being the local charge made by the Georgia Company on similar freight carried by it from Atlanta to Social Circle. Now, as will be seen, under the "arrangement" between these three railroad companies each participated in a division of both rates, and that in the division in the rates to Social Circle each received more than it did in the division of the rate to Atlanta or Augusta, and, although in the division of the rate to Social Circle the Georgia road received its

regular local charge, yet the court, in view of the arrangement covering both rates, properly held that the mere fact that the division of the rate to Social Circle resulted in allowing the Georgia road to receive its usual local charge did not withdraw the traffic from federal control.

In this case, however, the evidence fails to show any arrangement between the defendant and the Baltimore & Ohio Railroad Company, and fails to show any arrangement between them other than for the collection at the point of final destination of the freight charges due both companies, and weekly settlements of such collections, and the payment of any balance found to the company to which it may belong. There was no through bill of lading, and no conventional division of through charges; but each company received its own freight charges in accordance with its own rates. The defendant delivered the goods on its platform at Bellaire, and the Baltimore & Ohio Railroad Company, when notified, removed them to its own cars, and the defendant did the same with goods carried to Bellaire by the Baltimore & Ohio Railroad Company. The difference in gauge prevented a continuous carriage in the same car from the point of original shipment to the point of final destination. The goods were delivered and received by the defendant as a connecting carrier, and there can be no inference from that fact alone of an arrangement between the two companies for a continuous carriage or shipment of the goods within the meaning of the interstate commerce laws. In the absence of special contract or "arrangement," the common-law duty of the defendant as a common carrier was only to safely convey over its own route and safely to deliver to the consignee or to the next connecting carrier, and the evidence fails to show any "arrangement" between the two companies for a continuous carriage or shipment other than such as is imposed by the common law. See Myrick v. Railroad Co., 107 U. S. 102, 1 Sup. Ct. 425, 27 L. Ed. 325, and Express Cases, 117 U. S. 1, 6 Sup. Ct. 542, 628, 29 L. Ed. 791.

Notwithstanding the eggs were destined to be carried into another state and the defendant knew that fact, yet they were to be so carried by another independent agency, and the defendant's connection with their carriage ended within the state of Ohio when it delivered them to the Baltimore & Ohio Railroad Company as the next connecting carrier and the coils of rope were received for carriage by the defendant as the next and as an independent carrier for carriage and delivery within the state.

Judgment will be entered for the defendant.