PACIFIC EXP. Co. *v.* SEIBERT, State Auditor, *et al.*

HOEY *v.* SAME.

*(Circuit Court, W. D. Missouri, W. D.   October 22, 1890.)*

1. EQUITY JURISDICTION—INJUNCTION—TAXATION.
    Where a suit is not essential to the collection of a tax, and a penalty is imposed for delay in paying the tax, and no action lies to recover back the tax if paid, equity has jurisdiction to determine the legality of the tax, and enjoin its collection if illegal.

2. SAME—MULTIPLICITY OF ACTIONS.
    The fact that a penalty is imposed for each day's delay in the payment of a tax, and that the state might bring a separate action for each day's penalty, is no ground for the interference of a court of equity in order to prevent a multiplicity of actions, since it will not be presumed that the state would institute vexatious litigation.

3. TAXATION—INTERSTATE COMMERCE.
    Act Mo. May 16, 1889, which imposes on companies carrying goods "by express, on contract with any railroad or steam-boat company," a tax on their "receipts for business done within this state," is not an interference with interstate commerce.

4. SAME—CONSTITUTIONAL LAW.
    Said act does not deprive the express companies of the equal protection of the laws, or constitute inequality of taxation, since the state has a right to tax different kinds of property in different ways.

5. EXPRESS COMPANIES—COMMON CARRIERS.
    An express company is a common carrier which, at regular periods, over fixed routes, carries money and articles of value in the charge of its own messenger, on passenger steamers and railway trains which it does not own, but with the owners of which it contracts for the carriage of its messengers and freights.

In Equity.   Bill for injunction.

This case arises under the following act of the legislature of the state of Missouri:

"An act to define express companies, and to prescribe the mode of taxing the same, and to fix the rate of taxation thereon. Be it enacted by the general assembly of the state of Missouri, as follows: Section 1. Any person, persons, joint-stock association, company, or corporation incorporated under the laws of any state, territory, or country, conveying to, from, or through this state, or any part thereof, money, packages, gold, silver, plate, articles, goods, merchandise, or effects of any kind, by express, on contract with any railroad or steam-boat company, or the managers, lessees, agents, or receiver thereof, (not including railroad companies or steam-boats engaged in the ordinary transportation of merchandise and property in this state,) shall be deemed to be an express company. Sec. 2. Every such express company shall annually, between the 1st day of April and the 1st day of May, make and deliver to the state auditor a statement, verified by the oath of the officer or agent making such report, showing the entire receipts for business done within this state of each agent of such company doing business in this state for the year then next preceding the 1st day of April, for and on account of such company, including its proportion of gross receipts for business done by such company in connection with other companies: provided, that the amount which any express company actually pays to the railroads or steam-boats within this state for the transportation of their freight within this state may be deducted from the gross receipts of such company, as above ascertained: and provided, further, that said amount paid to the various railroad or steam-boat companies for transportation shall be itemized, showing the amount paid to each railroad or steam-boat company: and provided, further, that nothing herein contained shall release such express companies from the assessment and taxation of their tangible property in the manner that other tangible property is assessed and taxed. Such company making statement of such receipts shall include as such all sums earned or charged for the business done within this state for such preceding year, whether actually received or not. Such statement shall contain an abstract of the amount received in each county and the total amount received for all the counties. In case of the failure or refusal of such express company to make such statement before the 1st day of May it shall then be the duty of each local agent of such express company within this state annually, between the 1st day of May and the 1st day of June, to make out and forward to the state auditor a similar verified statement of the gross receipts of his agency for the year then next preceding the 1st day of April. When such statement is made, such express company shall, at the time of making the same, pay into the treasury of the state the sum of two dollars on each one hundred dollars of such receipts. And any such express company failing or refusing for more than thirty days after the 1st day of June in each year to render an accurate account of its receipts in the manner above provided, and to pay the required tax thereon, shall forfeit one hundred dollars for each additional day such statement and payment shall be delayed, to be recovered by an action in the name of the state of Missouri, on the relation of the state auditor, in any court of competent jurisdiction, and the attorney general shall conduct such prosecution; and such company, corporation, or association so failing or refusing shall be prohibited from carrying on said business in this state until such payment is made. Sec. 3. There being no law in this state by which such express companies are taxed, creates an emergency within the meaning of the constitution. Therefore this act shall take effect and be in force from and after its passage. Approved May 16, 1889."

The bill alleges in substance that the plaintiff is a corporation organized under the laws of the state of Nebraska, and is conducting business as an express company in Missouri and many other states, "conveying money, packages, gold, silver, plate, articles, goods, and merchandise to,

from, and through the state of Missouri and various parts of said state, by express;" that in the prosecution of said business it does not provide its own transportation, but carries all its express matter "on contract with the Missouri Pacific Railroad Company and various other railroad companies;" that in the prosecution of its business it receives express freight in many states, and carries the same, for hire, to points in the state of Missouri, and receives such freights within the state of Missouri, and conveys the same to points within other states, and that it receives such express matter at points within the state of Missouri, and conveys the same to other points within said state; that there are "other persons, copartnerships, associations, and corporations residing and doing business within the state of Missouri, who were engaged in conveying to, from, and through the said state, and various parts of the same, goods and property of the descriptions aforesaid, for hire, by freight and by express, but not on contract with any railroad or steam-boat company, or the managers, lessees, agents, or receiver thereof, within said state, such persons, copartnerships, associations, and corporations being either provided with their own transportation facilities, or procuring the same, by hire, from other persons, not a railroad or steam-boat company, or the manager, lessees, agent, or receiver thereof." The bill then refers to the act of the legislature hereinbefore set out, and alleges that it is not a valid law, because it lays a tax on interstate commerce, and discriminates in favor of all express companies that do not hire their transportation by "contract with any railroad or steam-boat company" and against those who do, by imposing the tax on the latter only, thus denying to the plaintiff the equal protection of the laws, in violation of the constitution of the United States, and violating the rule of equality and uniformity of taxation required by the constitution of the state of Missouri. The bill prays that the act of the legislature may be decreed to be unconstitutional, and the defendants enjoined from enforcing said act, or attempting to collect any tax or penalty therein provided for. A temporary injunction was granted on filing the bill. The case is now before the court on demurrer to the bill.

The case of *Hoey* v. *The Same Defendants*, and similar in all respects, was submitted at the same time.

*W. W. Morsman*, for Pacific Express Co.

*Edward S. Robert*, for plaintiff Hoey.

*John M. Wood*, Atty. Gen., for defendants.

Before CALDWELL and PHILIPS, JJ.

CALDWELL, J., (*after stating the facts as above.*) Does the bill present a case of equitable jurisdiction? A very clear case must be made out before a federal court will enjoin the collection of a state tax. A case for the exercise of such jurisdiction is not made out by showing that the tax is illegal, irregular, or unjust. It must also appear that its collection will be attended with a multiplicity of suits, or the destruction of a franchise, or cast a cloud upon the title to real estate, or some other recognized head of equity jurisdiction must be shown. This being a personal tax, no cloud can be cast on the title to real estate. The supreme

court of the United States, speaking by Mr. Justice MILLER, states the rule in these terms:

"We do not propose to lay down in these cases any absolute limitation of the powers of a court of equity in restraining the collection of illegal taxes, but we may say that, in addition to illegality, hardship, or irregularity, the case must be brought within some of the recognized foundations of equitable jurisdiction, and that mere errors or excess in valuation, or hardship or injustice of the law, either before or after payment of taxes, will not justify a court of equity to interpose by injunction to stay collection of a tax." *State Railroad Tax Cases*, 92 U. S. 614.

The case last cited, and the case of *Dows* v. *Chicago*, 11 Wall. 108, are leading cases on this subject. These cases have been cited, and their doctrine approved, applied, and illustrated in many other cases in that court, and they furnish rules of decision obligatory on all federal courts. It is needless to repeat here the reasoning in support of these rules. It is set forth with convincing power in the two cases cited and in many others. *Hannewinkle* v. *Georgetown*, 15 Wall. 548; *Tennessee* v. *Sneed*, 96 U. S. 69. The plaintiff contends that in addition to the alleged illegality of the tax there are, in this case, special grounds of equitable jurisdiction. It is said if the tax is not paid the plaintiff incurs a penalty of $100 per day, and is prohibited from doing business in the state during the period that it refuses to pay the tax, and that it is competent for the state to bring a separate suit for the penalty that accrues each day. All this is undoubtedly true. But the plaintiff has in its power to avert all these penalties and disasters by paying the tax. The tax is a personal one, touching which Judge Cooley says:

"When a tax as assessed is only a personal charge against the party taxed, or against his personal property, it is difficult, in most cases, to suggest any ground of equitable jurisdiction. Presumptively the remedy at law is adequate. If the tax is illegal, and the party makes payment, he is entitled to recover back the amount." Cooley, Tax'n, 772.

In *Brewer* v. *Springfield*, 97 Mass. 152, it is said:

"Until the plaintiffs have been compelled to pay the tax which they allege to have been illegally assessed upon them, they have suffered no wrong. When they have paid it they can recover it back by an action at law, which would furnish them an adequate and complete remedy."

The sound rule is that it is better the citizen should pay an alleged illegal tax, and test its legality in a suit at law to recover the money back, than that the state should be deprived of the revenues essential to its existence during the life of a chancery suit, which is usually protracted. In *Dows* v. *Chicago*, *supra*, the court say:

"Assuming the tax to be illegal and void, we do not think any ground is presented by the bill justifying the interposition of a court of equity to enjoin its collection. The illegality of the tax, and the threatened sale of the shares for its payment, constitute of themselves alone no ground for such interposition. There must be some special circumstances attending a threatened injury of this kind, distinguishing it from a common trespass, and bringing the case under some recognized head of equity jurisdiction, before the preventive remedy of injunction can be invoked.   *   *   *   And except where the special circumstances which we have mentioned exist, the party of whom an illegal

tax is collected has ordinarily ample remedy, either by action against the officer making the collection or the body to whom the tax is paid. Here such remedy existed. If the tax was illegal, the plaintiff, protesting against its enforcement, might have had his action, after it was paid, against the officer or the city to recover back the money, or he might have prosecuted either for his damages. No irreparable injury would have followed to him from its collection. Nor would he have been compelled to resort to a multiplicity of suits to determine his rights. His entire claim might have been embraced in a single action."

The government of the United States has made this rule statutory. An act of congress declares that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court." Rev. St. U. S. § 3224. Appeals are given to the executive departments, and if the party aggrieved does not obtain satisfaction in this mode, there are provisions for recovering the tax after it has been paid by suit against the collecting officer. Referring to this statute, the supreme court say:

"And though this was intended to apply alone to taxes levied by the United States, it shows the sense of congress of the evils to be feared if courts of justice could, in any case, interfere with the process of collecting the taxes on which the government depends for its continued existence. It is a wise policy. It is founded in the simple philosophy derived from the experience of ages that the payment of taxes has to be enforced by summary and stringent means against a reluctant and often adverse sentiment; and to do this successfully other instrumentalities and other modes of procedure are necessary than those which belong to courts of justice. See *Cheatham* v. *Norvell*, (decided at this term;) *Nichols* v. *U. S.*, 7 Wall. 122; *Dows* v. *Chicago*, 11 Wall. 108." *State Railroad Tax Cases, supra.*

Similar statutes are in force in some of the states. *Tennessee* v. *Sneed*, *supra.* These statutes are legislative recognitions of the principle that no government can permit its claims for public taxes on the citizen to become the subject of judicial controversy, according to the course of the law of the land. Imperative necessity has forced a distinction between such claims and all others. *Murray's Lessee* v. *Improvement Co.*, 18 How. 272, 282. Speaking of the rule which requires the citizen to pay the tax, and test its validity, in a suit for its recovery, the supreme court say:

"There is nothing illegal, or even harsh, in this. It is a wise and reasonable precaution for the security of the government. No government could exist that permitted the collection of its revenues to be delayed by every litigious man, or every embarrassed man, to whom delay was more important than the payment of costs." *Tennessee* v. *Sneed, supra.*

The citizen cannot appeal to equity for an injunction to stay the collection of a personal tax if he has an adequate remedy at law; and he has an adequate remedy at law if, after paying the tax, he can sue the state or the officers who collected the tax to recover it back. And his remedy at law is also adequate in the case of a personal tax, if the state can only collect the tax by suit or other proceeding that will afford to the citizen an opportunity to contest its validity without incurring penalties or forfeitures in the mean time.

We have not been cited to any statute or decision of the supreme court of the state showing that if the plaintiff paid the tax a suit would lie against the state or her officer to recover it back. In the view taken by the court of the other points in the case, the decision of this question, one way or the other, would not change the result, and the court will therefore assume, for the purposes of this case, that by the laws of Missouri an action could not be maintained to recover back a tax like this. The act we are now considering does not contemplate a suit to collect the tax. The amount of the tax cannot be known until the company makes a return of its earnings; and the making of this return, and the payment of the tax, are by the provisions of the act enforced by the imposition of a penalty of $100 per day, and the denial of the right to do business in the state so long as the company is delinquent. While it is true that the plaintiff might contest the validity of the act in any suit brought by the state to collect the penalty imposed for the non-payment of the tax, that would not be an adequate remedy, for the reason that during the pendency of such a suit the penalty of $100 would be accruing each day, and the plaintiff be denied the right to carry on its business in the state. It would take months, and possibly years, to reach a final decision of the case, and, if that decision should be favorable to the state, the penalty visited on the company would be very heavy indeed, including, as it would, the penalty of $100 per day for the whole period, and the destruction of its business in the state, and probably great injury to its business in other states. Equity abhors penalties, and holds the remedy at law inadequate when the assertion of the alleged right at law will be, or may be, attended by the imposition of heavy penalties and forfeitures. And upon this ground, and because an action will not lie under the laws of Missouri to recover back the tax if paid, equity has jurisdiction in this case.

Multiplicity of suits having also been earnestly urged upon the court as a ground of jurisdiction in the case, it is proper to consider that question. It is real and not imaginary suits, it is probable and not possible danger of multiplicity of suits, that will warrant the assumption of jurisdiction on that ground. While it is true, as the plaintiff contends, that the state might bring a separate suit for each day's penalty, the court would hardly be justified in acting on the assumption that it would do so. The state is not to be looked upon in the light of a barrator, and the court will not impute to it, or to its officers acting for and in its name, a litigious or vindictive spirit, or a purpose needlessly to vex and harass the citizen with lawsuits. Whatever the rule may be in the case of natural persons, the court will presume that a state is incapable of such a vulgar passion, and, until the fact is shown to be otherwise, will act on the assumption that a state will not bring any more suits than are fairly necessary to establish and maintain its rights.

The disposition of the case on its merits depends on the construction of the statute imposing the tax. The first question is, does the tax imposed by the act, upon the express company's receipts, amount to a regulation of or an interference with interstate commerce? The tax is im-

posed on the receipts for "all sums earned or charged for the business done within this state." These words qualify the whole act. They are plain and unambiguous. The words "for the business done within the state" *ex vi termini* import business begun and ended in the state, and include only intrastrate, and not interstate, commerce. The interjection of the intensifying words "wholly" or "entirely" would not alter their meaning or change their legal effect. Interstate commerce is not "business done within" the state of Missouri. It is business done between two or more states. A package carried by the plaintiff from Omaha to St. Louis is not business done within the state of Nebraska, or the state of Missouri, but is business done between those two states. A contract for the carriage of goods from one state to another is an entire contract, and is an interstate contract, and the carriage of the goods under such a contract is interstate commerce, and is not "business done within" any of the states from, through, and to which they are carried on such contract. Before the passage of this act the supreme court of the United States had decided, in several cases, that it was not competent for a state to levy a tax upon earnings derived from interstate commerce. *Telegraph Co.* v. *State Board*, 132 U. S. 472, 10 Sup. Ct. Rep. 161; *Leloup* v. *Port of Mobile*, 127 U. S. 640, 8 Sup. Ct. Rep. 1380, and cases there cited; *Ratterman* v. *Telegraph Co.*, 127 U. S. 411, 8 Sup. Ct. Rep. 1127; *Lyng* v. *State*, 135 U. S. 161, 10 Sup. Ct. Rep. 725. The law as contained in these decisions was common knowledge before the passage of this act, and it is obvious that the general assembly had these decisions in view in drafting the act. The limitation of the tax to the receipts on business done within the state is explicit, and is three times repeated. The legislative intent, not to impinge on interstate commerce, is manifest. But if the meaning of the act was doubtful, the doubt must be resolved in favor of its validity. It is a canon of construction that when an act of the legislature admits of two interpretations, one of which brings it within, and the other presses it beyond, their constitutional authority, the courts will adopt the former construction. But if the act could be construed to embrace the earnings derived from interstate commerce, that would not render the whole act invalid. It would still be valid as to the earnings derived from intrastate commerce, and the plaintiff would have to pay the tax on the receipts of its business done within the state. *Ratterman* v. *Telegraph Co.*, 127 U. S. 411, 8 Sup. Ct. Rep. 1127; *Telegraph Co.* v. *State Board*, 132 U. S. 472, 10 Sup. Ct. Rep. 161.

The next contention is that the act deprives the plaintiff of the equal protection of the laws secured to it by the fourteenth amendment to the constitution of the United States, and violates the rule of uniformity and equality of taxation required by that article and the constitution of the state of Missouri. This contention is rested on the words of the act that limit its operation to express companies that carry "by express, on contract with any railroad or steam-boat company." Neither the constitution of the United States, nor of the state of Missouri, requires taxes to be levied by a uniform rule upon all descriptions of property, or that all taxes on franchises, licenses, and privileges should be equal, or im-

posed by a uniform rule. For purposes of taxation, property and franchises, licenses and privileges, may be classified, and the different classes valued or taxed by different methods. The pursuits of mankind have become so varied, and property has assumed so many forms, many of them artificial and complicated, that different classifications of property, for purposes of taxation, and the valuation of different classes by different methods, are rendered imperatively necessary. And franchises, licenses, and privileges may be classified according to their several natures, and each class taxed a different rate and by a different method, or some may be taxed and others not. There is no evasion of the requirement of equality or uniformity so long as all in the same class are subject to the same tax under the same conditions. These principles have been repeatedly affirmed by the supreme court of the United States. In the latest utterances of that court on this subject it is said:

"The provision in the fourteenth amendment, that no state shall deny to any person within its jurisdiction the equal protection of the laws, was not intended to prevent a state from adjusting its system of taxation in all proper and reasonable ways. It may, if it chooses, exempt certain classes of property from any taxation at all, such as churches, libraries, and the property of charitable institutions; it may impose different specific taxes upon different trades and professions, and may vary the rates of excise upon various products; it may tax real estate and personal property in a different manner; it may tax visible property only, and not tax securities for payment of money; it may allow deductions for indebtedness, or not allow them. * * * We think that we are safe in saying that the fourteenth amendment was not intended to compel the state to adopt an iron rule of equal taxation." *Railroad Co.* v. *Pennsylvania*, 134 U. S. 232, 237, 10 Sup. Ct. Rep. 533. "But the amendment does not prevent the classification of property for taxation, subjecting one kind of property to one rate of taxation and another kind of property to a different rate, distinguishing between franchises, licenses, and privileges and visible and tangible property, and between real and personal property. Nor does the amendment prohibit special legislation. Indeed, the greater part of all legislation is special, either in the extent to which it operates, or the objects sought to be obtained by it. And when such legislation applies to artificial bodies it is not open to objection if all such bodies are treated alike, under similar circumstances and conditions, in respect to the privileges conferred upon them and the liabilities to which they are subjected. Under the statute of New York all corporations, joint-stock companies, and associations of the same kind are subjected to the same tax. There is the same rule applicable to all under the same conditions in determining the rate of taxation. There is no discrimination in favor of one against another of the same class. See *Barbier* v. *Connolly*, 113 U. S. 29, 32, 5 Sup. Ct. Rep. 357; *Soon Hing* v. *Crowley*, 113 U. S. 703, 709, 5 Sup. Ct. Rep. 730; *Railway Co.* v. *Humes*, 115 U. S. 512, 523, 6 Sup. Ct. Rep. 110; *Railway Co.* v. *Mackey*, 127 U. S. 205, 209, 8 Sup. Ct. Rep. 1161; *Railway Co.* v. *Beckwith*, 129 U. S. 26, 32, 9 Sup. Ct. Rep. 207." *Insurance Co.* v. *State*, 134 U. S. 594, 606, 607, 10 Sup. Ct. Rep. 593.

In the light of the doctrine of these cases it is plain the act we are considering is not in contravention of the fourteenth amendment. The act imposes the same tax on all express companies, in the same circumstances and conditions. It is not averred in the bill, and was not contended in argument, that any person, company, or corporation engaged

exclusively in the express business owns and operates its own railroads and steam-boats for the exclusive purpose of carrying its express messengers and freights. There are no such express companies. In *Re Express Cos.*, 1 Int. St. Com. R. 349, 367, the question was presented to the commission whether express companies were within the provisions of the interstate commerce act. In enumerating the reasons set up by the express companies against the claim that they were within the act, the commission say: "The words 'its railroad,' the express companies say, exclude the idea that they are intended by the law, for they have no railroads; they neither own nor operate any railroad lines;" and the commission concurred in this view. The act of the legislature of Missouri applies to express companies proper, and contains a brief, and, as far as it goes, accurate definition of them. From the origin of express companies down to the present time a distinguishing and uniform feature of their method of conducting business has been the hiring of railroad and water transportation for their messengers and freights. It is a common carrier that does not own any means of transportation, but hires other common carriers (railroad and steam-boat companies) to carry its freight and messengers. It may be defined to be, a common carrier that carries at regular and stated times, over fixed and regular routes, money and other valuable packages, which cannot be conveniently or safely carried as common freight, and also other articles, and packages of any description, which the shipper desires, or the nature of the article requires, should have safe and rapid transit and quick delivery, transporting the same in the immediate charge and custody of its own messenger, on passenger steamers and express and passenger railway trains, which it does not own or operate, but with the owners of which it contracts for the carriage of its messengers and freights, and within cities and towns or other defined limits it collects from the consignors and delivers to the consignees at their places of business the goods that it carries. *Express Cases*, 117 U. S. 1, 6 Sup. Ct. Rep. 542; *Retzer* v. *Wood*, 109 U. S. 185, 3 Sup. Ct. Rep. 164; 1 Int. St. Com. R. 273; *In re Express Cos.*, 1 Int. St. Com. R. 349. The court is bound to take judicial notice of a matter of public history and facts notorious to persons of ordinary intelligence. It would be discrediting to the court to affect to believe that there was any person in Missouri conducting an express business without the use of railroad or steam-boat transportation. The freighting business of this country was once carried on in wagons, propelled by animal power, on dirt roads, but that method of transporting common freights has been rendered obsolete by the railroads and steam-boats. Such a thing as an express company dissociated from transportation by rail or steamer is unknown. In the case of Hoey, suing as a shareholder in the Adams Express Company against these same defendants, submitted for decision with this case, and depending on the same questions, the bill alleges that the Adams Express Company, in conducting its express business, "utilizes over nineteen thousand miles of interstate railway communication." It is true, there are in cities and towns persons and corporations that carry goods and parcels in wagons or carts

from one place in a city or town and its vicinity to another, as chance may offer. But that is not an express business. A statute of the United States provided "that any person, firm, company, or corporation carrying on or doing an express business shall be subject to and pay a duty of three per centum on the gross amount of all the receipts of such express business." Under this statute the collector of internal revenue required one Retzer to pay a tax for carrying on an "express business." Retzer's business was the carrying of goods, freights, and baggage, in wagons, between New York and Brooklyn, and from one place in Brooklyn to another place in the same city. He did not run regular trips, nor over regular routes, but when and where he had orders. Upon these facts the supreme court of the United States held that Retzer was not carrying on an "express business." The court said:

"We are of the opinion that the plaintiff was not liable to this tax, because he did not carry on or do an 'express business,' within the meaning of the statute. Although he carried goods between New York and Brooklyn, and from one place to another in either city, he did so solely on call and at special request. He did not run regular trips, or over regular routes or ferries. He was no more than a drayman or truckman, doing a job when ordered. The fact that he had a place in Brooklyn where orders could be left on a slate made no difference. The words 'express business,' in the statute, must have the meaning given them in the common acceptation. An 'express business' involves the idea of regularity as to route or time, or both. Such is the definition in the lexicons." *Retzer* v. *Wood*, 109 U. S. 185, 187, 3 Sup. Ct. Rep. 164.

But suppose a business like Retzer's could be called an "express business." It differs so essentially in methods and conditions from the business defined by the act we are considering that it is obvious that they may be differently classed for taxation, and that the rule of equality and uniformity would not be violated by varying either the rate or the method of taxing them. The legislature might well consider a tax on the teams and wagons sufficient in the one case, and a tax on the earnings necessary in the other, or it might exempt the one and tax the other, without impinging on the fourteenth amendment. See *Gibson Co.* v. *Car Co.*, 42 Fed. Rep. 572, 574. The express business taxed by this act differs so materially from that conducted by other common carriers, and is so clearly defined and understood to be a distinct and separate branch of business, that it was eminently proper, if not imperatively necessary, if it was to be taxed at all, for the legislature to class it by itself, and, having so classed it, it was competent for the legislature to impose such a tax on its earnings for business done within the state as its wisdom dictated, not in excess of any limit prescribed by the constitution of the state. In the first annual report of the Interstate Commerce Commission (1887, p. 13) it is said:

"Some of the railroad companies, however, have undertaken to do the express business on their own lines, through their own agencies. The Baltimore & Ohio Railroad Company did this for a time, and then sold the business to one of the existing express companies. Some of the western railroads combine for the purpose, and for convenience create a nominal corporation to do the business over their several lines, and divide the net proceeds. *    *    *

"There is no recognized distinction between what shall be considered express freight and what not, except that which concerns the method of transportation."

When a railroad company, by the addition of a new bureau or department, and the adoption of new methods in the conduct of its business, qualifies itself to do the business commonly done by an express company, it does not thereby itself become an express company. Such an expansion or extension of its business as a common carrier works no change in its corporate character. Nor does it escape taxation on such new business. All schemes for the taxation of railroads, however much they may vary in details, are intended to include, and do include, in one way or another, a tax on all their property, income, and franchises. If the tax is not in terms laid upon their business and income, due regard to these is had in imposing the tax on their property and franchises. It may be conceded that there are no means of ascertaining whether a railroad company pays more or less tax on the earnings derived from its express business than is paid by an express company; but if it is admitted to be less, that is not the want of equality that falls under the ban of the constitution; but it results from the difference in the constitution, methods, and business pursuits of the two corporations which justifies the legislature in classifying them differently for purposes of taxation and taxing them by different methods. What is true of one railroad company is true of any association of railroad companies. All business they do as railroad companies is taxed in the general scheme for the taxation of railroads. It is not alleged in the bill in this case that the persons and corporations, which, it is averred, are carrying goods "by freight and by express," are not taxed. The complaint is that they are taxed at a different rate, and by a different method, from that applied to the plaintiff and all others who carry freight "by express on contract with any railroad or steam-boat company." The plaintiff's contention is that those carriers who own their transportation, and are common carriers of all manner of freights, shall be taxed at the same rate and by the same method as those carriers who hire their transportation, and whose business is limited to the carriage of express matter; in a word, that, for purposes of taxation, railroad companies shall be classed with express companies, and taxed at the same rate and by the same rule. There are inherent and fundamental differences in the corporate franchises, rights, and duties, property and methods of business, of a railroad company and an express company. These differences forbid their being classed together for purposes of taxation. Such a classification would be extremely incongruous. Because of this difference between the railroad companies and the express companies the latter could not be brought within the purview of the interstate commerce act. *Case of the Express Companies,* 1 Int. St. Com. R. 349; *U. S.* v. *Morsman,* 42 Fed. Rep. 448. Except as to their visible and tangible property, there seems to have been no law for taxing express companies until the passage of this act; for the legislature, in the third section of the act, assigns as a reason for putting the act in force from its passage the fact of "there be-

ing no law in this state by which such companies are taxed." Will any one seriously contend that before the passage of this act railroad companies could have successfully resisted the payment of taxes because express companies were not taxed, or that they can now do so because the method of taxation is different? If the rule contended for by the plaintiff is sound, it must be reciprocal, and, if express companies are not liable for the tax because they are not classified for taxation with railroad companies, and taxed in the same manner, then the railroad companies can object to paying taxes because they are not classified with express companies and taxed by the same method. For purposes of taxation they have no relation to each other, and the method of taxing them may be as widely different as the legislature in its wisdom chooses to make it. The demurrer to the bill is sustained, the temporary injunction dissolved, and the bill dismissed for want of equity.