## MERCHANTS' WAREHOUSE CO. v. UNITED STATES et al.

District Court, E. D. Pennsylvania.
Oct. 8, 1930.

BUFFINGTON, Circuit Judge, dissenting.

M. Hampton Todd, of Philadelphia, Pa., for Merchants' Warehouse Co.

H. Edgar Barnes and Owen J. Roberts, both of Philadelphia, Pa., for Pennsylvania Warehousing & Safe Deposit Co.

John P. Connelly, of Philadelphia, Pa., for Philadelphia Warehousing & Cold Storage Co.

Allen S. Olmsted, 2d, of Media, Pa., for intervening plaintiffs Commercial Exchange of Philadelphia and others.

Elmer B. Collins, of Washington, D. C., for the United States.

J. Stanley Payne, of Washington, D. C., for Interstate Commerce Commission.

John J. Hickey, of Washington, D. C., and Theodore L. Reimel, of Philadelphia, Pa., for intervening defendants.

Before BUFFINGTON, Circuit Judge, and THOMPSON and DICKINSON, District Judges.

THOMPSON, District Judge.

The Merchants' Warehouse Company, the Pennsylvania Warehousing & Safe Deposit Company, and the Philadelphia Warehousing & Cold Storage Company filed bills in equity praying for an order and decree to annul and set aside an order of the Interstate Commerce Commission entered on December 28, 1929. The order of the Commission was promulgated in three cases, which were consolidated, heard together, and decided in the report of the Commission, entitled Gallagher et al. v. Pennsylvania Railroad Company, 160 I. C. C. 563.

The complaints before the Commission charged that certain allowances paid to the plaintiff warehouse companies by the Pennsylvania Railroad Company, the Reading Company, and the Baltimore & Ohio Railroad Company, defendants before the Commission, subjected the complainant warehouse companies to unjust discrimination, undue prejudice, and disadvantage, and unduly preferred and advantaged the plaintiff warehouses, with which the complainants were competitors as warehousemen, in violation of sections 2 and 3 of the Interstate Commerce Act (49 USCA §§ 2, 3).

The plaintiff warehouses and the complainants before the Commission, who are intervening defendants in this proceeding, operate at Philadelphia warehouses, at and from which they ship and receive, load, unload, store, distribute, and deliver in small quantities carload lots of merchandise, known as "package freight," carried or to be carried at carload rates, which they have previously solicited for such handling from their customers located generally in cities outside of Pennsylvania. For those services they collect from their customers certain warehouse rates and charges.

The business in which the warehouses with which we are concerned are engaged, is thus described in the Commission's report:

"In all the larger cities, including Philadelphia, public warehouses are customarily used for the receipt, storage, and distribution of merchandise. That these warehouses perform an important public service is undisputed. The merchandise warehouse receives goods in carloads and distributes them in smaller quantities to local jobbers or retailers, or reships them in less-than-carload lots to near-by destinations; issues negotiable and nonnegotiable receipts, provides insurance, and allows credit to be obtained on merchandise stored; provides recoopering, marking, and separation of varieties, and various incidental clerical services. Warehouse services enable manufacturers to keep spot stocks for their customers; equalize production by steadily absorbing the manufacturers' output

while eliminating heavy investment in reserve storage space; reduce freight charges and save time in transit through handling goods in carload quantities; reduce fire risk and loss and damage claims; and eliminate the necessity of providing storage space at point of origin. Both complainants and the contract warehouses furnish these services."

The plaintiffs in the instant case operate, in competition with the interveners, who were complainants before the Commission, the same type of warehouses and render the same kind of services generally as the intervenors, for which charges are collected from their customers. The carriers, the Pennsylvania Railroad Company, the Baltimore & Ohio Railroad Company, and the Reading Company, pay to the plaintiffs, in connection with the loading, unloading, and "handling" by them of such merchandise, certain sums, ranging from 30 cents to 50 cents per ton, but make no such payments to the warehouses which were complainants before the Commission. No payments are made if the shipments are unloaded within the forty-eight hours free time. The Pennsylvania Railroad Company pays the allowances in question to the Merchants' Warehouse Company, the Baltimore & Ohio to the Pennsylvania Warehousing & Safe Deposit Company, and the Reading Company to the Philadelphia Warehousing & Cold Storage Company, the plaintiffs here. Payments are also made by the Pennsylvania to the Quaker City Cold Storage Company and by the Reading to the Pennsylvania Warehousing & Safe Deposit Company.

In some instances, the carriers own the land or warehouses which the plaintiffs hold under lease. In other instances, the carriers do not own the land or the warehouses.

In the report of the Commission, because of the fact that the payments, which are alleged to be preferential, discriminatory, and prejudicial as against the intervening defendants, are made in accordance with contracts with the respective carriers of many years standing, the warehouse companies, which receive the allowances, are designated as "contract warehouses."

The contracts provide that the warehouse shall accord to traffic passing over the lines of the carrier preference in facilities furnished by the warehouse over traffic passing over other lines; shall load or unload or handle freight received to be shipped over the lines of the carrier, or received by the warehouse from the carrier for delivery to consignees; shall notify the consignees of the arrival of in-coming freight; shall be responsible for the prompt collection of freight charges and other charges upon in-bound freight; shall indemnify and hold harmless the carrier for all damage to and all loss of freight in the custody of the warehouse; shall maintain fire insurance; shall notify the carrier of the failure of consignees to receive freight; shall comply with directions with respect thereto received from the carrier; shall indemnify the carrier against liability on account of any of the warehouses' acts of omission and on account of bills for merchandise issued by the warehouse. For those services the carriers agree to make payments to the contract warehouses as provided in the contracts.

The terminal services of the contract warehouses include the removing and recording of the seals from the cars placed for unloading, placing seals on loaded cars and preserving the record thereof, examining the merchandise, noting the damage and the cause thereof, the prompt inspection of the equipment, prompt loading and unloading to minimize delay, storing the shipment for the forty-eight hours free time, including protection against fire through insurance, taking up bills of lading and canceling the same, delivering the merchandise to the consignee and taking receipts therefor, handling claims for damage, disposal of refused merchandise, executing bills of lading for out-bound shipments, tallying the contents of the cars.

The record thoroughly establishes the fact that the contract warehouses and the intervening warehouses are engaged in the same kind of business, and each ships and receives at its warehouses package freight of all kinds destined to or shipped from various points in the United States over the railroads, and that the circumstances and conditions surrounding handling and movement of the traffic are similar if not identical. It is further shown by the record that the services which the contract warehouses perform, for which the contracts provide for the payment of compensation by the carrier to them, are performed, for their patrons, by the intervening defendants who were complainants before the Commission; that the latter load and unload the freight for their patrons, pay and collect freight charges, send notices of arrival to their customers, check the contents of the cars, give the railroads reports, notify the railroads of damage to the freight, prepare bills of lading, mark and stencil packages, recooper and perform in general identical services for their patrons.

As to this, the Commission finds:

"The services performed by the contract warehouses do not differ in substance from those rendered by complainants. The warehouses of complainants and those of the contract warehouses are served by private sidetracks or sidings connecting with the lines of one or more defendants. Both handle the same classes of freight, and both obtain business by widespread advertising in prominent trade publications, by sending letters, pamphlets, and circulars to prospective customers offering them their services, and by personal solicitation. There is active and keen competition between complainants and the contract warehouses. Concerns using public-warehouse facilities generally select the company offering them the lowest aggregate charge for the distribution of their goods. By means of the allowances the contract warehouses are able to quote lower charges than can complainants."

Evidence was introduced on behalf of the complainants before the Commission for the purpose of showing that all of the services performed by the contract warehouses, including the loading of freight into, and the unloading of freight from, railroad cars, are warehouse trade services which are performed by all merchandise warehouses under the terms of their contracts and arrangements with their patrons, the manufacturers and wholesalers, and not transportation services, and that the contract warehouses' premises were not in fact public terminals of the carriers.

The Commission found from the evidence that:

"* * * The contract warehouses are compensated for the solicitation of freight for movement over the lines of the respective defendants through the payment of the allowances in question; that traffic considerations have been the primary motive for the payment of these allowances; that the facilities of the contract warehouses, while nominally open to the general public as railroad freight stations, are not in fact public stations but are confined to the handling of merchandise for the patrons of the warehouses; and that the services performed by the contract warehouses in connection with the loading or unloading of freight, including the sending of arrival notices, the collection of freight charges, and other incidental matters, are in fact performed for the benefit of the owner of the merchandise rather than for defendants.

"While the contract warehouses are not the owners of the goods received or shipped by them, all of defendants' dealings are with these companies and none with the owners of the goods. As to many of the inbound carload shipments the contract warehouses are the only parties to whom delivery of the goods could be made as carload shipments, the real owners being concerns which ship carload merchandise to the contract warehouses for distribution in less-than-carload lots. The contract warehouses, even though not the owners of the goods, have been given dominion over such goods for transportation purposes, and accordingly for transportation purposes they should be deemed the consignors of shipments from or consignees of shipments to their warehouses. The same is true as to complainants, shipments from and to their warehouses being handled in substantially the same manner."

The Commission concluded that:

"* * * The practice of defendants in making allowances to the contract warehouses in connection with the loading or unloading of package freight at Philadelphia as aforesaid, and refusing to make similar allowances to complainants for performing similar services, results in unjust discrimination, in undue preference of the contract warehouses, and in undue prejudice to complainants. The record discloses that these allowances are nothing more than a device to attempt to lend legality to the payment of rebates to the contract warehouses. It is apparent that the unjust discrimination and undue prejudice can lawfully be corrected only by terminating the allowances."

The Commission accordingly entered its order of December 28, 1929, requiring the defendant railroads to cease, desist from, and abandon publishing or making allowances to the contract warehouses in connection with the loading or unloading of package freight at Philadelphia, and requiring the Pennsylvania and the Baltimore & Ohio Railroads to cancel tariff provisions which had been published by them, making the contract warehouses a part of their station facilities at Philadelphia.

Although the railroads were defendants before the Interstate Commerce Commission, they did not intervene in the instant proceedings and took no part through counsel or otherwise at the hearing and argument of the case. We must assume, therefore, that they are satisfied with the order requiring them to desist from the payments and to cancel their

tariff provisions, not only those under which the payments are made to the petitioners, but those in which the petitioners' warehouses are designated as public freight stations.

The original contracts, which the Commission has declared discriminatory and prejudicial, had their origin when there was nothing unlawful in contracts or arrangements between interstate carriers and the shipping public in making such allowances or deductions out of freight rates as have since been denounced and made unlawful by existing law, so that the question before the court is not whether the system set up was ethically bad, but whether it is condemned by the law as it now is.

It is insisted on the part of the plaintiffs that the findings and order of the Commission are not supported by substantial evidence. It is not, however, contended that the courts may put their judgment as to finding of fact based upon substantial evidence against that of the Commission. The court may not inquire into the expediency of the order, nor will it consider facts further than to determine whether there was sufficient evidence to support the order. Interstate Commerce Commission v. Union Pacific Railroad, 222 U. S. 541, 32 S. Ct. 108, 56 L. Ed. 308; Nashville Railway Company v. Tennessee, 262 U. S. 318, 43 S. Ct. 583, 67 L. Ed. 999; Assigned Car Cases, 274 U. S. 564, 47 S. Ct. 727, 71 L. Ed. 1204. The courts will not inquire into the soundness of the reasoning whereby the Commission's conclusions are reached. Interstate Commerce Commission v. Illinois Central Railroad Company, 215 U. S. 452, 30 S. Ct. 155, 54 L. Ed. 280; Skinner & Eddy Corporation v. United States, 249 U. S. 557, 39 S. Ct. 375, 63 L. Ed. 772. These are matters left by Congress to the administrative tribunal appointed by law and informed by experience. Illinois Central Railroad Company v. Interstate Commerce Commission, 206 U. S. 441, 27 S. Ct. 700, 51 L. Ed. 1128. Assigned Car Cases, supra. And whether a practice is unjustly discriminatory or preferential is a question of fact entrusted exclusively by the act to the Commission for determination upon the evidence in a particular case. Interstate Commerce Commission v. Alabama Midland Railway Company, 168 U. S. 144, 18 S. Ct. 45, 42 L. Ed. 414; Nashville Railway v. Tennessee, supra.

The case is very similar to the case of Terminal Warehouse Company of Baltimore City v. United States et al. (D. C.) 31 F.(2d) 951, 957, where the Terminal Warehouse Company of Baltimore had a contract or arrangement with the Pennsylvania Railroad Company substantially similar to the contracts involved here. In the proceeding before the Commission, the practice of the railroad, in paying the Terminal Company allowances for the performance of terminal services in connection with the loading and unloading of package freight at Baltimore, was found by the Commission to result in an unjust discrimination as against the McCormick Warehouse Company, which was conducting a warehouse business in competition with the Terminal Warehouse Company. The bill of complaint was dismissed upon the ground that the finding by the Commission of discrimination and unreasonable preference was sustained by the evidence before the Commission.

In discussing the contentions of the Terminal Warehouse Company, Judge Soper said:

"The contention of the Terminal Warehouse Company is that the Commission's order is wrong, because the Warehouse Company has been designated in the tariff as a public station of the carrier, and hence in this place the carrier is obliged, under the exception to rule 27, to load and unload carload freight, and may employ and pay the Terminal as its agent to do the work. But the conclusion to which the Commission came destroys the essential premise upon which this argument is based; for it found that the Terminal Warehouses, although nominally open to the general public, are in fact confined to the receipt and forwarding of merchandise concerning which the Terminal is employed to render some warehouse service. We are bound by this conclusion of fact, if it is supported by substantial evidence. Anchor Coal Co. v. U. S. (D. C.) 25 F.(2d) 462, 471. In our opinion, the evidence not merely supports, but requires, the conclusion which the Commission has reached. It is true that 20 per cent. of all carload package freight, shipped to Baltimore over the Pennsylvania, is handled by the Terminal Warehouse, and that any shipper, desiring warehouse facilities, may send his goods to its platform. But these circumstances do not constitute these warehouse a public station. It is not used by shippers or consignees, who do not require or desire the services of the Terminal Warehouse Company, and either do not make use of any warehouse, or send their goods to other warehouses of a private or public character. The distinction between this situation and that in the case of U. S. v. Baltimore &

Ohio Railroad, 231 U. S. 274, 34 S. Ct. 75, 58 L. Ed. 218, upon which the complainant relies, is obvious; for there the premises used by the carrier as a freight station, although furnished and operated by a nearby shipper, who used it to a greater extent than any other shipper, was nevertheless open to all shippers and actually used for the benefit of all alike."

It is contended on behalf of the plaintiffs, in discussing Judge Soper's consideration of the argument for the Terminal Warehouse Company, that, while the evidence in that case may have justified the finding of the Commission that the warehouses there in question were not railway terminal stations, the decision was based upon the undisputed evidence that no shippers or consignees, who were not customers of the warehouse company, used the warehouse as a shipping or delivery station. It is argued that in the instant case there is not sufficient evidence to show that shippers generally do not use the contract warehouses as railroad freight terminals, and they point, as evidence to the contrary, to testimony before the Commission showing that, during one year, 744 carloads of freight were brought by team and loaded in carload lots at the Merchants' Warehouse, which were not placed in storage. It is argued that the negative testimony was not sufficient to support the finding of fact by the Commission in the face of the testimony about the 744 carloads.

As to the first proposition, that the positive evidence was not sufficient to establish the fact, we think that there is enough substance in it to support the Commission's findings, in view of the rule stated above that the courts cannot put their judgment as to conclusions of fact against that of the Commission. As to the testimony contra, it is not shown anywhere, as to the 744 carloads, that any of the shippers of those carloads of freight were not patrons of the warehouse company handling them, although it performed no storage services as to those particular shipments, and the railroad company did pay it for loading onto the cars, as agreed under the contract. Moreover, there is evidence, oral and documentary (the latter through circulars, advertisements, and pamphlets, soliciting business as merchandise and distributing warehousemen), that the sidings of the contract warehouses, where the cars were "spotted" for loading or delivered for unloading, were designated by them as their "private sidings."

It is further argued on behalf of the plaintiffs that the service of loading, unloading, assorting, storing, and delivering the carload shipments rendered by the plaintiffs for their patrons at their warehouses after the carriers had delivered the cars to them upon their warehouse sidings, is not a trade service, but is a transportation service. As has already been stated, the services rendered by the intervening warehouses are in every substantial detail the same as those rendered by the contract warehouses.

It cannot be contended that the intervening warehouses render a transportation service. If, therefore, under identical facts and circumstances their service to their patrons is not a transportation service, how can that of the contract warehouses become so merely because the railroads agree to perform the loading and unloading at the contract warehouses, and designate their private sidings as railroad terminals?

The question as to whether or not they are transportation services is a question of fact and, if supported by substantial evidence, is conclusive upon the court. United States v. Erie Railroad Company, 280 U. S. 98, 50 S. Ct. 51, 74 L. Ed. 187; Assigned Car Cases, supra.

There is no evidence of record to show that the railroads exercise any control over the plaintiffs' warehouses or their business, except that shown by the contracts, under which it is contended for the plaintiffs that they are employees and agents of the railroad company for performing the duties of loading and unloading, which the railroads, it is claimed, are under an obligation to perform for shippers and consignees at their designated terminal stations. This obligation, if it is such, arises from the fact that the Pennsylvania Railroad and the Baltimore & Ohio Railroad have made provision in their tariffs by which they take upon themselves the service to consignors and consignees of loading and unloading carload package freight carried at railroad rates.

Rule 27 of the official Consolidated Freight Classification, to which the carriers are parties, provides as follows:

"Section 1. Owners are required to load into or on cars freight for forwarding by rail carriers, and to unload from cars freight received by rail carriers, carried at carload ratings."

The Pennsylvania Railroad and the Baltimore & Ohio Railroad provide in their tariffs by exceptions to Rule 27 that they agree to load or unload carload package freight at certain Philadelphia freight stations, included among which are the contract warehouses.

The Reading Company has no such tariff provisions, but also pays its contract warehouses for performing the work of loading and unloading carload package freight as agreed in the contracts.

The plaintiffs point to these tariff provisions as justification for the payments by the railroads, upon the ground that the railroads, having assumed the obligation to load and unload, which under Rule 27 above cited rests upon the consignors and consignees, have exercised their right to select their employees to do this work for them and to designate their own terminal stations as the place where the service is to be performed; that, having the tariff obligation, they may limit themselves to the selection of their employees and may lawfully select the plaintiffs as such without being guilty of any unlawful discrimination, preference, or prejudice.

██ It is well settled that a railroad carrier may exercise its own discretion in the selection of its agents and employees to perform any part of its transportation service and that the mere granting of privileges, which are incidentally a part of the compensation for services rendered, is not unlawful as preferential or discriminatory as against others who are not thus selected. Del., L. & W. R. R. Co. v. Morristown, 276 U. S. 182, 48 S. Ct. 276, 72 L. Ed. 523; Donovan v. Pennsylvania Co., 199 U. S. 279, 26 S. Ct. 91, 50 L. Ed. 192; Great Northern Ry. Co. v. Minnesota, 238 U. S. 340, 35 S. Ct. 753, 59 L. Ed. 1337; Express Cases, 117 U. S. 1, 6 S. Ct. 542, 628, 29 L. Ed. 791, and 117 U. S. 601, 6 S. Ct. 1190, 29 L. Ed. 791; Chicago, St. L. & N. O. R. Co. v. Pullman Car Co., 139 U. S. 79, 11 S. Ct. 490, 35 L. Ed. 97; Black & White Taxicab Co. v. Brown & Yellow Taxicab Co., 276 U. S. 518, 48 S. Ct. 404, 72 L. Ed. 681, 57 A. L. R. 426.

But there is substantial evidence to support the facts found by the Commission that the warehouses of the plaintiffs are not in fact open public freight stations of the railroads; that the service rendered by them under the contracts is a trade service and not a transportation service, in that it was rendered by the contract warehouses and by the interveners, each for its patrons in precisely the same way; that thereby the plaintiffs are enabled to perform such service for their patrons for a lower charge than that for which the interveners can perform the same service to their patrons.

█ It is clear that the payment of the allowances by the railroads under the contracts was not a consideration for employment in a transportation service.

█ Passing to the contention that the Commission was wrong in finding that the contract warehouses, even though not the owners of the goods, had been given dominion over such goods for transportation purposes and accordingly for transportation purposes should be deemed the consignors of shipments from or consignees of shipments to their warehouses, it is contended here, as it was in Terminal Warehouse v. United States, supra, that, inasmuch as the Bills of Lading Act, 39 Stat. 545, § 42 (49 USCA § 122) provides that, unless the context otherwise requires, "consignor" and "consignee," respectively, mean the person named in the bill as the person from whom the goods have been received for shipment, or to whom the delivery of the goods is to be made, the contract warehouses cannot be deemed the consignors or consignees because the billing invariably names a consignor or consignee other than the warehouses.

It is well settled that the actual situation underlying a shipment rather than recitals in the shipping documents should control the application of the acts of Congress. And while the billing in the instant case did not name the contract warehouses as consignors or consignees and the documents in consignments were made out "in care of" the warehouses, it is inconceivable that the mere wording of the shipping documents can justify a course of action which would otherwise be contrary to law. Terminal Warehouse Co. v. United States, supra.

The Supreme Court has held that carriers may not lawfully discriminate for or against forwarders of goods. I. C. C. v. Del., L. & W. R. Co., 220 U. S. 235, 31 S. Ct. 392, 55 L. Ed. 448; United States v. Lehigh Valley R. R. Co. (D. C.) 222 F. 685; Lehigh Valley Railroad Co. v. United States, 243 U. S. 444, 37 S. Ct. 434, 61 L. Ed. 839. We follow the reasoning of Judge Soper in Terminal Warehouse Company v. United States, supra:

"Both the warehouse and the forwarder solicit and obtain the transportation of goods. The forwarder is concerned with the assembling of goods into carload lots at the point of shipment and the carriage of the same to one consignee, who may be the forwarding agent himself, and who receives the goods and distributes them to the parties for whom they are intended. The warehouseman is chiefly concerned with the receipt and distribution of goods from the carrier after they have

reached their destination. It is true that the forwarder is usually the consignor or the consignee of the goods, and it may be conceded arguendo that the warehouse company in this case is not. But both are closely related to the carriage of the goods and to the carrier, and both are entitled to the protection of the statute."

In our opinion, the Commission was right in finding that the actual business of the warehouses was not that of rendering service to the railroad companies in loading and unloading, and in storage for the account of the railroad companies, but that they were conducting a general warehousing business for their own patrons and that the payments made by the railroad companies under the guise of rendering service to them put the contract warehouse companies in the position of preference and advantage over the intervening warehouse companies which had the facilities and were engaged in business precisely similar to that of the plaintiffs; that by means of the payments the contract warehouses were enabled not only to obtain a preference and advantage for themselves over competing warehouses, but also were enabled to perform for their patrons warehouse services and other services in connection with transportation at a less rate than could be obtained for shippers who were patrons of the intervening warehouses.

We conclude that the payment of the allowances by the railroads under the contracts comes within the provisions of section 2 of the Interstate Commerce Act, as amended by section 404 of the Transportation Act of 1920 (49 USCA § 2), in that the contracts constitute devices whereby the carriers receive from the contract warehouses, through the deduction out of freight rates of the allowances, a less compensation for services rendered than they charge and receive from the intervening warehouses for doing a like service under substantially similar circumstances and conditions, and thereby subject the latter to unjust discrimination.

We further conclude that, under section 3 of the above Act (49 USCA § 3), the payment of the allowances gives an undue and unreasonable preference and advantage to the contract warehouses, and subjects the intervening warehouses to an undue and unreasonable prejudice and disadvantage.

Several trade and commercial organizations intervened on behalf of the plaintiffs, and at the argument and in their briefs they have reinforced the contentions of the plaintiffs and have predicted serious results to the commercial interests of Philadelphia in case the order of the Commission is allowed to stand. While these arguments ab inconvienti have had due consideration, we must determine the issues involved, unaffected by what the results may be, in accordance with the law as enacted. Such results as may flow from the order of the Commission are properly for the consideration of Congress and not the courts.

The bills are dismissed.

DICKINSON, District Judge, concurs.

BUFFINGTON, Circuit Judge (dissenting).

This case concerns an order to desist issued by the Interstate Commerce Commission. There is no dispute about the facts. The only issue is one of law, namely, the legal conclusion drawn from uncontradicted facts. Addressing myself to the latter and taking one renewal contract as fairly illustrative of an agreed on practice beginning some forty years ago, I note that the Pennsylvania Railroad Company, hereafter called railroad, and the Merchants' Warehouse Company, hereafter called warehouse, on January 25, 1917, contracted in writing, wherein the purpose of the parties was thus stated:

"Whereas the parties hereto desire to enter into an agreement with respect to the handling and storage of flour, grain and other merchandise *at the warehouses of the said Warehouse Company* situated on the plot of land bounded by Delaware Avenue, Walnut, Water and Chestnut Streets, in the City of Philadelphia, and State of Pennsylvania." 

To carry out such purpose, railroad agreed to maintain tracks adjacent to warehouse, shift and deliver cars to warehouse "for the purpose of taking from and delivering to the same all freight to be shipped therefrom or delivered thereto." It further agreed to take and deliver such freight "at non-discriminatory rates and in the same manner and with the same promptness that it delivers and receives like traffic at any other terminal point controlled by it in the City of Philadelphia."

Railroad further agreed to pay warehouse "for all services rendered by it in and about the receipt and delivery of freight for account of the railroad company, both incoming and outgoing at the said warehouses," 3½ cents per barrel of flour up to 50,000 barrels a month and 2½ cents over 50,000, and 40 cents per ton of merchandise freight, etc. Railroad agreed not to go into storage busi-

ness during the life of the contract, provided, however:

"That this covenant shall not be construed so as to prevent the Railroad Company from warehousing freight in its terminals as an incident to delivery thereof or from entering into contracts for storage or other disposition of refused or unclaimed freight, nor shall it be so construed as to interfere with the performance by the Railroad Company of all obligations imposed upon it by law in respect 'to the carriage, storage or delivery of traffic."

On its part, warehouse agreed:

"To indemnify and hold harmless the Railroad Company for all damage to, or loss of, freights in the custody or control of the Warehouse Company, and all liability by reason thereof, and to keep an adequate and sufficient line of fire insurance on all such freight to cover the liability of the Railroad Company therefor."

It agreed to collect and to be responsible for all freight on incoming shipments; to save the railroad harmless for damage to freight; to keep freight insured; to notify consignees of the arrival of goods; to notify railroad of nonremoval of freight, and "so long as it holds *the said freight for account of the railroad company, to observe and comply with all directions with respect to such freight which may be received by it from the railroad company.*"

Warehouse further covenanted:

"To protect and indemnify the Railroad Company from and against all manner of liability on account of any acts of omission or commission on the part of it, the said Warehouse Company, in respect to merchandise received by it at said warehouses, to be forwarded over the Railroad Company's lines or to be delivered to consignees, and also from and against all manner of liability on account of receipts for merchandise issued by it."

It was mutually agreed that at *"The expiration of the period during which the railroad shall currently allow freight* to remain at his warehouse before delivery without charge" and freight has not been delivered to the consignee, such undelivered freight "shall be regarded and treated as stored with warehouse company by railroad for account of the owners thereof." The agreement ran for twenty years, with year to year continuance by consent, and was nonassignable by warehouse. While it was in force, railroad was not to make any allowances to any other person or corporation for freight loading or unloading services to or from Philadelphia warehouses. The freight received and forwarded by these warehouses was for carload shipments and not for the noncarload freight which the railroad was equipped for and did handle at its own freight stations.

During the forty years such contracts have been in force, no shipper has complained either of the service afforded by the warehouse; of the use by the railroad of these warehouses as railroad forwarding or receiving stations; or that there has been in any way any discrimination in favor of other shippers, of any nontariff rates exacted on freight or any rebate or allowance made or paid to other shippers. These contracts have been made with warehouses along their lines by all the three trunk lines that serve Philadelphia, and there has been no complaint by them or any minor railroads that such contracts have diverted traffic from their lines. In point of fact, on delivery of freight to the merchandise company, such freight was dealt with in precisely the same way as though delivered at an ordinary freight station of the railroad and when in-coming freight arrived at the warehouse, it was treated exactly as the railroad would have done had it arrived at a regular station, namely, kept free of charge for the customary free days and subjected to storage charges if kept longer. On its face these contracts seem fair and legal. They have been acted on for years. During the period the government operated the railroad, no change was made in practice and there was no suggestion of illegality sanctioned or participated in by the government during its control. As we have said, no shipper is complaining. The railroads, which have taken no part in this controversy, have found the system helpful in the prompt handling and quick release of cars, and substantially all of the public trade bodies of Philadelphia have intervened and urged its continuance.

Turning to the proofs from the trade bodies representing the commerce of Philadelphia, and taking the present warehouse as an example, it is clear that this system of handling the great flour distributing system of a metropolitan city was the gradual evolution of years of experience and that it was the outgrowth of the needs of a great food supplying business itself, calling on the railroads to help it, and not a system forced on shippers by the railroad. Hubert J. Horan, president of the Commercial Exchange, was familiar with the whole development. His tes-

timony was that up to 1883 and prior to the establishment of storage warehouses, carload lots of freight were brought down Market and other streets and delivered to the private warehouses which lined the streets. After the street tracks were taken up, the railroad built this Merchants' Warehouse, controlling it itself, but giving the public free right to buy stock. In other cases of these contract warehouses the entire stock was privately owned and the railroads held none of its stocks. The reason for building them was to avoid the time lost in tieing up unloaded cars. What was wanted was an expeditious release of cars and lessening the number of them coming to their own stations and standing unoccupied on the railroad's own sidings. Without entering into details, it suffices to quote from this well informed and practically experienced witness, who says:

"This here thing has been worked out on the basis of the economic method of handling flour, and I might say the profits in the flour business are at the minimum and always have been."

The basic connection of this flour system with the food supply of the city is testified to by him as follows, and there is no proof to the contrary:

"Q. Would it be possible to go back to the old method of handling the flour, which was in effect prior to 1887? A. I do not see how it would be possible for a flour man today, when you take into consideration the tremendous growth of Philadelphia since, and that we have to make deliveries to almost every part of Philadelphia—now for West Philadelphia as an illustration, we use 31st and Chestnut; for Kensington we use the warehouse up there; downtown we use 15th and Carpenter, Front and Federal, or Central we use Front and Chestnut. To get warehouses we couldn't get railroad connections today, I don't believe, and to make an economical delivery for the benefit of the people—the consumer, it would be an impossibility, and the cost would grow to such tremendous figures that I don't know, we would all have to localize our business. In other words, we could not make distribution really economically over the city of Philadelphia today."

Moreover, his testimony shows the great necessity of handling flour in the most economic way, as the profit is but 15 cents a barrel and if the present system was abolished, "it would put an additional burden on the articles of 50 cents a ton, or practically, on flour, of five cents a barrel, and the problem then would arise *as to our ability to transfer that burden to the consumer,* and we would be in a position where it would be really a question of whether we could do it." He further testified his judgment was that the margin of the profit of the flour dealers was so small—15 cents a barrel—that if the present system were changed, Philadelphia dealers in freighted flour could not continue the flour business and it would be absorbed by the big local mills. The practical mind will at once see that while the extinction of 5 cents profit on a barrel of flour seems so small as to amount to nothing of moment, in reality that 5 cents cuts down the possible present profit of the flour business 33⅓ per cent., a proportion which in its aggregate is sufficient to destroy such business.

Moreover, it goes without saying that the instant discharge of carload freights made by the contract warehouses and the consequent return to service of the cars, instead of allowing such cars to congest on railroad sidings and await discharge by a consignee at the end of forty-eight hours, is a basic factor in prompt railroad freight service. In that regard the proof by an official of the Reading Railroad is:

"These contracts were made many years ago, and of course there is no one available who can state of their own knowledge as to the conditions that brought about these agreements, but from general information that can be obtained, the railroad companies at that time felt the need of additional facilities, where this carload package freight could be unloaded and taken care of, delivered, where additional facilities could be provided for storage and general service that might be required by the commercial interests of Philadelphia. It was also a factor advantageous to the carriers in having the equipment promptly released, as would not be the case on team track deliveries, and that in my belief brought about these contracts with the warehousing concerns."

So also one of the Baltimore & Ohio Railroad officials says:

"As the contract shows the original contract, it was made in 1897, at the time the Baltimore and Ohio Railroad was in the hands of receivers. In fact the contract was made by the receivers. At that time the facilities of the Baltimore & Ohio Railroad were limited, and the receivers were quite anxious to increase the facilities here in some manner, shape or form, which would en-

able them to secure a much larger tonnage into and out of Philadelphia than had been handled."

The testimony of J. E. Sands, terminal freight agent of the Baltimore & Ohio Railroad, is:

"Well, in the operation of a freight station, it is an active going concern, and freight has to move currently, and any congestion—any surplus amount of freight on the facility naturally retards your operation. There is a certain amount of clearance that we really figure that we have to have for a smooth operation of a freight station, for we clear up daily, and if we were to attempt to handle excess freight, creating a congested condition, it would be a serious matter with us."

Seeing then that this contract warehouse system is shown to be a practice of forty years' standing; that similar contracts were from time to time made by the federal court of this district through its receivers; that these contracts were acted upon by the government during its operation of the railroad; that no shipper is complaining of any favoritism to competitors or burden imposed on him; that the large commercial bodies have felt the issue was of such vital importance to the commerce of Philadelphia as to constrain them to intervene and oppose the unsettling of the tried-out practice of a generation, and that the only parties who complain are six warehouses, the gravamen of whose complaint is that they have not been made by the several railroads public freight stations; that the order of the Commission does these six warehouses no good, in that it does not require the railroads to make these six warehouses public freight stations, but only compels the railroads to no longer make the twenty-four warehouses public freight stations for it—considering, we say, that such is the practical, commercial freight-handling situation before us, we next inquire whether the situation was an illegal one which called for the preventive power vested in the Interstate Commerce Commission to put an end to it. There is no proof of any corrupt motive, vicious purpose, or concealed or purposed fraud. Everything has been done openly and above board. The railroads have not and are not taking part in the controversy. No shipper is complaining and, as a practical question, the case resolves itself into a business dispute between twenty-four contract warehouses and six noncontract ones, with the Interstate Commerce Commission taking the part of the latter.

Does the case warrant the order that body has made in supposed relief of these six? We say "supposed relief," for in point of fact the order gives no affirmative relief to the six and only stops the present practice of the twenty-four. Its anticipated effect is to lessen railroad efficiency. It deprives shippers of the benefit of freight loading and unloading at twenty-four convenient public freight stations, and it puts an end to a business system which the twenty-four warehouses have carried on, in some cases, for nearly forty years, and that without complaint.

We here take occasion to say that there is no proof whatever that in any case any of these contract warehouses was the actual consignee of the in-bound carload freight delivered by them or the out-bound lots shipped by them. The few isolated instances where they received pay for handling their own shipments were evidently oversights and were in violation of the railroad's ordered tariff provision that "no payment will be made on any traffic consigned to or by the warehouse company." So far as out-bound freight was concerned, the proof is they simply received the freight from the shipper and shipped it as was done by the railroad freight agent at any of its other freight stations. In doing so they performed no service for the shipper and they did not make the use of their warehousing facilities a condition precedent to the shipper using the station. So far as in-bound carload freights were concerned, the shipper, in order to advise the railroad as to its particular destination, marked the car in care of such or such a contract warehouse. Far from designating or making the warehouse the consignee of his freight or authorizing the warehouse to receive the goods on his behalf and thereby discharge the railroad from liability, the shipper did nothing of the sort. On the contrary, the shipper retained his bill of lading and with the consequent right of stopping in transit, in no way surrendered or in any way qualified his ownership of his property and in fact did nothing by marking it in care of the warehouse, other than simply to show that the warehouse which the railroad by its contract made one of its freight stations was the particular railroad freight station to which he wished his goods to be forwarded. In point of fact, the sending it in care of the warehouse amounted to nothing more than if a shipper marked his freight "in care of John Doe, Pennsylvania, freight agent at Bryn Mawr, Pennsylvania." To our view, the finding of the Commission that this marking made the warehouse the

consignee of the freight had not only no proof to support it and is not a finding of fact, but is a mere conclusion or inference for drawing which there was no warrant or foundation. And, to our view, the upholding of this theory of imaginary consigneeship of the freight would deprive consignors of freight of one of the most valuable rights a shipper has in surrendering the custody of his freight to a public carrier, namely, constituting the carrier as his agent—with the consequent right of transit stoppage, until the carrier has terminated such agency by delivering such goods to the consignee designated by the consignor. Moreover, to so hold is to ignore the fact that the consignor has named the consignee and has mentioned the warehouse not as the consignee but as one in whose care the shipment is made. The bill of lading must be construed as a whole and every part given effect, and to say the name of the designated consignee which is written into the bill of lading is to have no effect because the warehouse, which is not named as consignee, is to be "deemed" the consignee because of the words "In care of," etc., is to violate a basic rule of construction and to substitute fiction for fact.

Indeed, the holding of the Commission can hardly be deemed a finding of fact, for it only is:

"The contract warehouses, even though not the owners of the goods, have been given dominion over such goods for transportation purposes, and accordingly for transportation purposes they should be deemed the consignors of shipments from or consignees of shipments to their warehouses."

Being merely a deduction, this court is at liberty to draw its own deductions and base its decree on its own view. See Bianchi v. Vere (C. C. A.) 17 F. (2d) 22, and Wolf Mineral Process Corp. v. Minerals Separation North American Corp. (C. C. A.) 18 F. (2d) 483, where it is said:

"When the fact is merely a deduction from other facts reported by him (Master) his conclusion is simply a result of reasoning of which the court is as competent to judge as he."

In point of fact, the warehouse is simply the railroad so far as the owner of the goods is concerned, for the uncontradicted proof is:

"We always receive the instructions, either from the carrier or from the owner of the merchandise. These instructions are received by messenger, by mail, by telegraph or by telephone, to be confirmed in writing."

Such conduct on the part of the warehouse was in compliance with the contract which, as we have quoted earlier, provided that the contract should not be so construed "as to interfere with the performance by the Railroad Company of all obligations imposed upon it by law in respect to the carriage, storage or delivery of traffic."

Moreover, the inference of the Commission that the warehouse "for transportation purposes should be deemed * * * consignee of shipments to its warehouses" is authoritatively negatived by the Bills of Lading Act, 39 Stat. 545, § 42 (49 USCA § 122), which provides "consignee" means the person named in the bill as the person to whom delivery is to be made. It will also be noted that the present holding of the Commission that the warehouse has "been given dominion over such goods for transportation purposes, and accordingly for transportation purposes they should be deemed consignors and consignees,", is at variance with the principle announced by its own holding in Smokeless Fuel Co. v. Norfolk & Western R. Co., 85 I. C. C. 395, which said: "The law seems to be well settled that the party to whom a shipment is consigned is the legal consignee and not the party in whose care the goods are shipped." This reasonable and common sense view has the approval of text-book authorities. See Hutchinson on Carriers (3d Ed.) Vol. 2, page 755, where it is said:

"Goods shipped to one person as consignee in care of another should be delivered to the consignee, and, in case he cannot be found then to the one in whose care they are shipped."

It is obvious that a railroad by undertaking performance of transportation does not by performing such transportation duties become the consignee of the goods. And if such is the case, how does the hiring by the railroad of some one else to perform a part of the railroad's services make such minor performer the consignee where the same acts, if done by the railroad, would have no such effect.

Yet it is upon this false assumption of the warehouse being the consignee that this entire proceeding is bottomed. The Commission saw that the fact that the warehouse was the consignee was a prerequisite to their order and that unless such was the fact, the order here involved could not be sustained.

That the railroad may by contract constitute a warehouse a public freight station is, as said by Supreme Court in United States v. Baltimore & Ohio Railroad, 231 U. S. 288,

34 S. Ct. 75, 79, 58 L. Ed. 218, "too clear for extended discussion." [1] If, then, such contract for substitution can legally be made, does it follow that because such a substitution is made with one warehouse and it is made a public freight station, that thereby the railroad has bound itself to establish as its additional public freight stations all other warehouses in that vicinity? We think not, for, as said in 276 U. S. 518, 48 S. Ct. 404, 407, 72 L. Ed. 681, 57 A. L. R. 426, "The grant of privileges to respondent creates no duty on the part of the railroad company to give like privileges to others, and therefore there is no illegal discrimination." Indeed, it would seem the mere statement of the proposition is its own answer. Now if the railroad can legally contract with one warehouse to make it a public freight station and if thereby it does not obligate itself to make every other warehouse a public station, it follows that in consideration of the designated warehouse agreeing to become a public station, the railroad may lawfully agree that it will not make any other warehouse a public station. For it will be observed that no warehouse has any general right to demand it be made a public freight station, but that it can be made such only when it and the railroad contract it shall be made such freight station.

Commenting on the freedom of railroads to control its passenger stations, the Supreme Court, in Delaware, L. & W. R. Co. v. Mor-

---

[1] To the same effect is the case of the Terminal Warehouse v. U. S. (D. C.) 31 F. (2d) 951, 956, where Judge Soper says:

"The authorities do show, as the Commission held, that in certain cases it is proper for a shipper or forwarder of goods to be paid for transportation service rendered to a carrier. See Interstate Commerce Commission v. Diffenbaugh, supra [222 U. S. 42, 32 S. Ct. 22, 56 L. Ed. 83], which was referred to in Lehigh Valley R. R. Co. v. United States, 243 U. S. 444, 37 S. Ct. 434, 61 L. Ed. 839, as being an authority which went to the verge of what is permitted by the Act to Regulate Commerce. It is also well settled that a carrier has full liberty to select its own agents to perform transportation service on its behalf, which it is under legal obligations to perform, and that it may employ one agent exclusively, and refuse to employ another. Covington Stock-Yards v. Keith, 139 U. S. 128, 11 S. Ct. 461, 35 L. Ed. 73; Express Cases, 117 U. S. 1, 6 S. Ct. 542, 628, 29 L. Ed. 791 [and 117 U. S. 601, 6 S. Ct. 1190, 29 L. Ed. 791]; Chicago, etc., R. R. v. Pullman Southern Car Co., 139 U. S. 79, 11 S. Ct. 490, 35 L. Ed. 97; Donovan v. Pennsylvania Co., 199 U. S. 279, 26 S. Ct. 91, 50 L. Ed. 192."

---

ristown, 276 U. S. 194, 48 S. Ct. 276, 279, 72 L. Ed. 523, said: "There was no duty upon petitioner [the railroad] to accord to other taxicabmen the use of its lands simply because it had granted Welsh the privileges specified in its contract with him." And in another case (Black & White Taxicab & Transfer Co. v. Brown & Yellow Taxicab & Transfer Co.) involving a similar question, the Supreme Court, in the same volume, at page 529, 48 S. Ct. 404, 407, 72 L. Ed. 681, 57 A. L. R. 426, said: "There is here no complaint by or on behalf of passengers; no lack of service, unreasonable exaction or inconvenience of the public is shown. It would be unwarranted and arbitrary to assume that this contract is contrary to public interest. The grant of privileges to respondent creates no duty on the part of the railroad company to give like privileges to others, and therefore there is no illegal discrimination." Now, if such contract as here involved be made, if there be no sinister purpose in making it, if its performance be an aid to the railroad in the movement of freights, if the public can avail themselves of this added facility, and the warehouse in good faith performs the part of the railroad in receiving and forwarding for all shippers alike their carload shipments, it would seem that such contracts and performance under them constitute a valuable and desirable aid to the railroad in the performance of its duty to transport.

Moreover, as under the contract all the service the warehouse performs as a public freight station, to wit, loading or unloading the freight, and the money paid for such service is reasonable in amount, such payment may properly be made.

That the warehouses were not only designated by contract as public freight stations, that they were held out as such on tariff schedules, but, over and above all, that they in good faith act as public stations for carload lots, is conclusively shown by the proofs, which, for example in the case of the Merchants', are that from January 1, 1928, to September 30, it received as agent from trucks and teams and forwarded on its principal's railroad seven hundred and forty-four carload lots of out-bound freight. That as to this freight it did no storage service and got no pay. That it received no pay whatever from the shippers for loading and no pay from the railroad save the contract allowance. As to such shipments, the railroad performed no pretransit service. It was all done for it by the warehouse. Notwithstanding such un-

contradicted proof, the Commission inferred that the warehouse has "been given dominion over such goods for transportation * * * they should be deemed the consignors of shipments from * * * their warehouses." Fortunately, in the interest of actual facts, the giving of the name of consignee or consignor to such a warehouse does not make it such if in truth and verity it was not the consignor or the consignee.

In view of the fact that the shipper has never surrendered his dominion, title to, and control of his shipment and that the warehouse has never acquired any title to or control of the shipment, but that by contract and practice under the contract the shipment remains subject to the control of the railroad and the shipper, it seems clear that to decide these cases on any other basis than that of the absolute and unquestionable liability of the railroad to the shipper for his goods until the shipper's actual, designated consignee has received them from the railroad, is to bottom a decision on imaginary sand and not on the bedrock of actual fact. True, the warehouse may stand in a potentially secondary or dual status, but that secondary status as warehouseman for the consignee can only arise after its primary status and duty, as the agent of the railroad, has been fulfilled and ended. The two duties are successive, not conjoint. On the one hand, the warehouse is the exclusive agent of the railroad until the latter's transportation ends by delivery to the shipper's consignee. On the other hand, the warehouse can only become the consignee's agent and the custodian for the consignee when the named consignee chooses to accept the freight from the railroad's agent. The dual relation of the warehouse as agent of the transporting railroad and as custodian for the consignee is a tandem and not an abreast relation. Indeed, as we sense this case, the decisive question is whether these warehouses were in good faith made public freight stations by the railroad and whether the warehouses have honestly and in good faith and reality acted as public freight stations in the receipt of outgoing and the delivery of incoming freight. That test was clearly pointed out and made the decisive factor in the Baltimore case. Terminal Warehouse Co. v. U. S. (D. C.) 31 F.(2d) 951, 957. A study of that case shows that the warehouses were designated in the tariff sheets as public freight stations, but in the proofs it was shown in that case, as Judge Soper says, "that the Terminal Warehouses, although nominally open to the general public, are in fact confined to the receipt and forwarding

of merchandise concerning which the Terminal is employed to render some warehouse service." In other words, the railroads and warehouses in that case compelled the shipper to submit to the warehouse storage charges if he used the station. In the present case no such condition exists. The shipper simply ships and the warehouse simply receives and forwards the freight thus received without compelling any, or even contracting for any, precedent storage. In the present case any out-bound shipper desiring storage or shipment, if he so desires, and any shipper not desiring warehouse facilities, may use the warehouse simply as a freight station. That the Baltimore case was decided on facts radically different from the crucial facts in this case is clear from Judge Soper's language, on page 957 of 31 F.(2d):

"The contention of the Terminal Warehouse Company is that the Commission's order is wrong, because the Warehouse Company has been designated in the tariff as a public station of the carrier, and hence in this place the carrier is obliged, under the exception to rule 27, to load and unload carload freight, and may employ and pay the Terminal as its agent to do the work. But the conclusion to which the Commission came destroys the essential premise upon which this argument is based; for it found that the Terminal Warehouses, although nominally open to the general public, are in fact confined to the receipt and forwarding of merchandise concerning which the Terminal is employed to render some warehouse service. We are bound by this conclusion of fact, if it is supported by substantial evidence. Anchor Coal Co. v. U. S. (D. C.) 25 F.(2d) 462, 471. In our opinion, the evidence not merely supports, but requires, the conclusion which the Commission has reached. It is true that 20 per cent. of all carload package freight, shipped to Baltimore over the Pennsylvania, is handled by the Terminal Warehouse, and that any shipper, desiring warehouse facilities, may send his goods to its platform. But these circumstances do not constitute the warehouse a public station. It is not used by shippers or consignees, who do not require or desire the services of the Terminal Warehouse Company, and either do not make use of any warehouse, or send their goods to other warehouses of a private or public character. The distinction between this situation and that in the case of U. S. v. Baltimore & Ohio Railroad, 231 U. S. 274, 34 S. Ct. 75, 58 L. Ed. 218, upon which the complainant relies, is obvious; for there the premises used by the carrier as a freight station, although

furnished and operated by a nearby shipper, who used it to a greater extent than any other shipper, was nevertheless open to all shippers and actually used for the benefit of all alike."

We have already noted some of the facts in reference to the use of these warehouses as public freight stations, and reference is further made to the fact that 35 per cent. at some of the contract warehouse stations and 75 per cent. at others were delivered to the actual consignees within the forty-eight hours of free time and were not warehoused at all. At the Pennsylvania Warehousing Stations from 40 to 60 per cent. of in-coming freights were taken away without being stored, and at the Philadelphia Warehouse & Cold Storage Stations 80 per cent. were so taken. These warehouses being then in truth and in fact used by the public and the railroads as public freight stations, it seems to me that the Baltimore case is an authority in favor of the warehouses and not of the Interstate Commerce Commission. Summarizing my view, I would vacate the order of the Commission.